GROSS, J.
In this case, we write to address two issues-whether the prosecutor’s closing argument improperly made a case for the credibility of a state witness and whether the testimony of two detectives about the reluctance of witnesses in the neighborhood of the shooting to be seen cooperating with the police was irrelevant and unduly prejudicial. Finding no error, we affirm.
I. Facts
A grand jury indicted Michael L. Jackson Jr. for first-degree murder with a firearm. The charge arose from eighteen-year-old Jackson’s shooting of a drug dealer, Jenoi Hand, on a street in West Palm Beach. The state’s chief witness was Ma-tia “Coco” Dingle, Hand’s lookout. Though other people were present at the time of the shooting, Dingle was the only eyewitness to identify Jackson as the shooter. The state’s case turned on her credibility. Jackson’s primary attack against Dingle’s credibility was that she was not there, so her testimony was made-up. Following a jury trial, Jackson was convicted and sentenced to life in prison.

A. Dingle’s Testimony

Dingle, in her mid-twenties, was a user of powder cocaine. When she was high, she was alert, energetic, and quiet. Dingle’s criminal history included possession of cocaine with intent to sell, giving a false name to a police officer, and retail theft. Hand, the victim, was her friend. They had been friends for over five or six years and Hand treated her “like [she] was somebody.” Hand sold crack cocaine. Testimony established that Hand’s territory, as recognized on the streets, was Sixth Street and Sapodilla Avenue. Dingle worked for Hand as a lookout, watching for police and potential robbers. For this, Hand paid her $50 to $80 a day, but did not compensate her with drugs.
On July 29, 2009, the night of the shooting, Dingle used powder cocaine and served as Hand’s lookout. Dingle and Hand hung out all that day and night on Sixth Street. Hand did not have his gun. A little after midnight, Shaniece “Shay Shay” Gaskin and Nakera “Kera” Dawson *1014 arrived in Dawson’s car. At some point, Hand and Dawson were inside her car— Hand was in the backseat, Dawson sitting on his lap — while Gaskin was outside riding around on Hand’s bicycle. Dingle was at the intersection of Sixth Street and Rosemary Avenue, down the street from the intersection of Sixth Street and Sapo-dilla Avenue. She was behind a taxicab stand snorting cocaine. As Hand’s lookout, Dingle’s attention was focused solely on Hand. The area was lit by street lamps. Dingle observed Hand conduct a drug sale. There were no problems and the customer left.
After the sale, Hand was in the middle of the road near Dawson’s car. Then appellant Michael Jackson, someone Dingle knew, “ran through the cut,” the area of land between two houses that were facing Sixth Street. Hand yelled out to Jackson, asking whether he was running from police. Jackson did not respond, but he approached Hand. They started talking to each other.
Bent over and snorting a line of cocaine, Dingle heard gun shots from the direction where Hand and Jackson were speaking. The shots caused Dingle to look up and she saw Hand on the ground. She rushed toward him, but her testimony was unclear on how close she got to Hand. Regardless, Hand was still alive.
Meanwhile, Jackson had run off toward the cut. He reloaded his gun and came back to where Hand was lying face up on the street. By that time, thinking that Jackson had seen her, Dingle had dived under a car and hid. As she lay under the car, she watched Jackson’s feet as Jackson shot Hand again. Jackson fled through the cut.
Scared, Dingle also ran away, in the direction of a club. She came back to the scene, however, after she heard an ambulance. Because she was scared and did not know what to do, Dingle acted like she had just arrived. A lot of people from the neighborhood were there. While Dingle was at the scene, television reporters showed up. Dingle told one reporter that Hand was her brother, people would miss him, she had just arrived on scene, and nobody knew anything. At trial, Dingle explained that she told the reporter something other than the truth because she was scared and, also, because she did not want to be seen on television discussing what happened.
Dingle talked with police at the scene, but again tried to act as if she had just arrived. Dingle did not want to be seen talking to the police in front of people from the neighborhood. Asked why, she explained: “Because when you do, people around the neighborhood call you the police, the snitch, all type of stuff.” Dingle was willing to talk to the police, but not in public. She, Dawson, and Gaskin walked down the street, where the police picked them up. They were transported to the police station. Once at the station, Dingle talked to the police.
Later, on August 15, Dingle spoke with Detective Dennis Hardiman, one of the investigators, in an interview room at the police station. At that time, Dingle told the detective everything she knew, including things she withheld the first time she spoke with police. She explained: “Because when I got with him, I felt, like, open with him, you know? So I just opened up to him and I just told him everything I knew.” Dingle said she did not feel open with the other police officers because they wanted to speak to her in front of other people. During the interview, Detective Hardiman conducted a photographic lineup; Dingle identified Jackson. She identified him again in court.
*1015 During the cross-examination of Dingle, Jackson’s attorney pressed Dingle on her previous statements denying that she was at the scene at the time of the shooting.
After rehashing her testimony about the night of July 29, Jackson’s attorney questioned Dingle on the statements she made at the police station that night. Dingle, Dawson, and Gaskin were put in a room at the police department where they were secretly recorded. Defense counsel asked Dingle whether she remembered making certain statements, to which Dingle responded that she had been high and, repeatedly, that she did not remember anything she said. Defense counsel played an audio recording of the conversation in an attempt to have Dingle identify her voice on it and, also, to refresh her recollection of what she said. Dingle was generally resistant to listening to the tape.
Dingle admitted telling a detective she was not there when the shooting occurred, something which was apparently captured on the recording. Dingle explained in court that, at that point, she did not want to get involved. Defense counsel played a portion of the tape in which it appears Dingle was asking the other women what the shooter was wearing. After some prodding, Dingle explained that she asked these questions to make it appear as if she had not been there, as she did not want to get involved. As cross-examination continued, Dingle became increasingly upset. Eventually, she asked the trial court whether she still had to answer questions.
Later, an issue arose as to a video-and-audio recording of the conversation between Dingle, Gaskin, and Dawson at the police station. While the parties previously thought the DVD contained only the same content as the audio recording Jackson’s attorney had earlier used, they later discovered that the DVD contained more than the audio recording. The trial court ordered the state to produce Dingle the day after she first testified so Jackson’s attorney would have an opportunity for full cross-examination.
The further cross-examination was contentious. Dingle resisted answering some of the questions. She complained that the defense attorney was “messing” with her. As she did the day before, Dingle maintained that she could not remember what she had said the night of the shooting. Defense counsel then played the DVD and pressed Dingle about what she said on the recording and challenged her testimony that she had witnessed the shooting.

B. Gaskin’s Testimony

Gaskin also testified, and her testimony largely corroborated Dingle’s. While she roughly described the shooter, she did not identify him. When asked if she saw Dingle at the scene when the shooting happened, Gaskin answered, “I can’t tell you that. I was shocked. I really wasn’t paying attention to nothing.” Gaskin repeated this on cross-examination. She said Dingle left the area of the shooting shortly after Gaskin and Dawson arrived, but she could not remember if Dingle ever returned because she was not paying attention. The first time she remembered seeing Dingle again was after the police arrived.
Gaskin stayed to talk to the police after the shooting, although she did not want to cooperate with them. Like Dingle, Gaskin did not want to be involved. She had the police meet her somewhere else: “Because I didn’t want nobody else to see me get in the car, the police car.” She, Dingle, and Dawson eventually went to the station. There, Gaskin described to Dingle in detail what she had seen. Dingle told her that she wished she had stayed at the scene, but she was suffering a headache.

*1016
C. Law Enforcement Testimony

The two detectives who investigated the shooting were Adam Myers and his partner Dennis Hardiman. On appeal, Jackson challenges their testimony on the general reluctance of people in the neighborhood to talk with law enforcement.[1]
Detective Myers provided the following testimony:
[By the State:]
Q. Okay. And on scene, did you talk to any witnesses?
A. Yes, I did.
Q. Did you talk to a Shaniece Gaskin or Shay Shay?
A. Yes.
Q. Did you talk to a Nakera Dawson?
A. Yes, I did.
Q. Who goes by Kera?
A. Yes.
Q. And could you tell us, as far as any other witnesses, would you describe whether they were cooperative or uncooperative?
A. They were very—
[DEFENSE COUNSEL]: Objection, relevancy.
THE COURT: Overruled.
THE WITNESS: They were very reluctant to cooperate with us.
BY [THE PROSECUTOR]:
Q. In fact, when you spoke to the women, were they willing to speak to you at length or give a taped statement at the scene?
A. No, they weren’t.
Q. And how did you eventually — or did you eventually get a chance to speak to them?
A. Well, obviously, we understood that they didn’t want to be seen speaking to us in view of the public, so we asked them if—
[DEFENSE COUNSEL]: Judge, I object to this, it’s relevance and hearsay.
THE COURT: Overruled.
THE WITNESS: So we asked them if they would come to the police station with us where we could speak in private.
BY [THE PROSECUTOR]:
Q. Were they willing to get into the police cars and come with you?
A. No, they were still reluctant to do so, especially if it was a marked car.
Q. Okay. And in your 11 years of experience with the West Palm Beach Police Department, why is it a problem for witnesses to get in a police car? [DEFENSE COUNSEL]: Objection, speculation, improper opinion, hearsay.
THE COURT: Overruled.
BY [THE PROSECUTOR]:
Q. Go ahead.
A. In my experience, it’s people don’t want to be known as a rat or snitching on other persons, and it’s a common problem we encounter.
Q. Okay. Did they eventually come to the police station?
A. Yes, they did.
Similarly, Jackson challenges the following testimony of Detective Hardiman:
*1017 Q.... Are you — you said you responded to homicides in this area before?
A. Yes, sir.
Q. Do you get to know the community in the area that you work, you talk to people?
A. Yes.
Q. You try to find witnesses and interview witnesses in these types of cases?
A. Yes.
Q. In your experience in homicides and the area of 6th and Sapodilla, when you tried to talk to witnesses, how do they respond to you, based on your experience working there?
[DEFENSE COUNSEL]: Objection, irrelevant, improper opinion, bolstering.
THE COURT: Overruled.
THE WITNESS: I would say, most of time, they were reluctant.
BY [THE PROSECUTOR]:
Q. Why do you say that, why are they reluctant?
[DEFENSE COUNSEL]: Objection to speculation.
THE COURT: Sustained.
BY [THE PROSECUTOR]:
Q. When you say, reluctant, do they want to talk to you?
A. No.

D. Closing Arguments

One of Jackson’s arguments on appeal is that the prosecutor improperly argued that Dingle was credible during her rebuttal argument. Before closing arguments began, the trial court instructed the jury that one of the things the jurors should consider in determining the reliability of witness testimony was whether the witness was “honest and straightforward in answering the attorneys’ questions.” Fla. Std. Jury Instr. (Crim.) 3.9.
In her closing argument, the prosecutor spent some time talking about whether Dingle was credible given her inconsistent statements, noting the trial court’s instruction above. The prosecutor argued that Dingle “answered those questions over and over and over and over again, and then after many hours of questions ... [s]he shut down, she had enough ... but up to that point for many, many hours, she answered every single question honestly and straightforward.” As an indication that Dingle answered questions in a straightforward manner, the prosecutor pointed out that Dingle even admitted to having lied and to having snorted cocaine. The prosecutor later went through the consistent elements of Dingle’s statements and her testimony, and how Dingle’s testimony was consistent with other evidence in the case.
Almost all of Jackson’s closing was devoted to attacking Dingle’s credibility. Jackson’s attorney pointed to inconsistencies within Dingle’s statements and between her testimony and the testimonies from other witnesses to contend that Dingle was not at the scene of the shooting. Defense counsel described Dingle as “a convicted felon. She is a convicted liar. Lied to the police. Lied to the police. She is a convicted thief. She is an ongoing drug addict.... You wouldn’t believe this witness if she were involved in a small claims action, would you?”
The prosecutor focused on Dingle’s credibility in her rebuttal:
So was Cocoa [sic] there? Cocoa [sic] spent a long day of deposition on another day, two days of testimony in front of you, testimony that night, testimony with Detective Hardiman, and she goes over and over and answers hundreds *1018 and hundreds of questions, and she is open and honest about each and every—
[DEFENSE COUNSEL]: Objection to the vouching.
THE COURT: Sustained.
[THE PROSECUTOR]: Until she can’t take it anymore and shuts down, and when she shuts down, you watched her, she had enough and that’s when you start getting, I don’t want to know, I don’t want to listen to that, I don’t want to hear it. Up until then she answers everything, answers everything, open and honest, fleeing her life, her life which is an unsophisticated life, an uneducated life, a criminal life.
[DEFENSE COUNSEL]: I object to the vouching, the bolstering, the characterization.
[THE PROSECUTOR]: Comments in evidence, Judge.
THE COURT: I disagree with that. I’ll overrule that objection.
And, later, the defense objected to this snippet of argument:
[Defense counsel] says, why would Cocoa tell you that she was asked about the reward money? Because she was telling the truth. She was asked question after question, she kept telling the truth, that’s why she told it.
II. Closing Argument
In his first issue on appeal, Jackson argues that the prosecutor’s comments in closing argument that Dingle was open, honest, and telling the truth were improper. Jackson contends that the prosecutor improperly bolstered or expressed a personal opinion on Dingle’s credibility.
The control of closing argument is within a trial court’s discretion; thus, a trial court’s rulings on comments made within closing arguments are reviewed for an abuse of discretion. Hooper v. State, 476 So.2d 1253, 1257 (Fla.1985). Likewise, a trial court’s ruling on a motion for mistrial is reviewed for an abuse of discretion, and the court should grant a mistrial only where the error is so prejudicial that it vitiates the entire trial. Cartwright v. State, 885 So.2d 1010, 1013 (Fla. 4th DCA 2004).
Attorneys have wide latitude in arguing to a jury. Breedlove v. State, 413 So.2d 1, 8 (Fla.1982). However, “attorneys must ‘confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence.’ ” Hosang v. State, 984 So.2d 671, 672 (Fla. 4th DCA 2008) (quoting Knoizen v. Bruegger, 713 So.2d 1071, 1072 (Fla. 5th DCA 1998)). When evaluating a prosecutor’s comment, the comment “should be examined in the context in which it is made.” Lubin v. State, 963 So.2d 822, 824 (Fla. 4th DCA 2007).
 Here, Jackson contends that the prosecutor impermissibly injected her personal opinion into the argument by stating that Dingle, whose credibility was hotly disputed, testified openly, honestly, and truthfully. By this argument, Jackson invokes the rule that “it is improper for an attorney to express a personal opinion as to the credibility of a witness.” Johnson v. State, 801 So.2d 141, 142 (Fla. 4th DCA 2001). But, “an attorney is allowed ... to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence.” Miller v. State, 926 So.2d 1243, 1254-55 (Fla.2006) (emphasis added). Improper prosecutorial “vouching” for the- credibility of a witness occurs “where a prosecutor suggests that she has reasons to believe a witness that were not presented to the jury,” or, stated differently, where the prosecutor “implicitly refers to information outside the record.” United States v. Rivas, 493 F.3d 131, 137 (3d Cir.2007).
*1019 Contrary to Jackson’s arguments, the prosecutor was not expressing her own opinion on Dingle’s credibility; rather, she was explaining why the jury should believe Dingle was a credible witness based on the evidence. This is clear from the context in which the prosecutor made the comments.
Both the prosecutor and defense counsel offered detailed arguments supporting or challenging Dingle’s credibility. They focused on the consistencies and inconsistencies contained in her various statements, and the consistencies and inconsistencies between those statements and the testimony of other witnesses. Additionally, the prosecutor pointed to Dingle’s admissions about lying to the police and using drugs as indicative of her straightforwardness as a witness. The prosecutor’s comments that Dingle was open, honest, and truthful were permissible because, in context, they were based on the evidence and in specific reference to her testimony. The prosecutor’s language — that Dingle was “open and honest” and “telling the truth” — echoed the language of the standard jury instruction the judge read to the jury, that, in deciding whether Dingle’s testimony was reliable, the jury should consider whether she was “honest and straightforward in answering the attorneys’ questions.” Fla. Std. Jury Instr. (Crim.) 3.9.
On point is Yok v. State, 891 So.2d 602 (Fla. 1st DCA 2005). In closing argument in a sexual battery case, the prosecutor stated “that the victim was ‘honest and straightforward’ while testifying.” Id. at 603. The trial court denied the defendant’s motion for mistrial. Id. The first district found that, when viewed in context, the comment did not constitute improper bolstering. Id. Instead, as in this case, “the prosecutor’s isolated comment simply urged the jury to find the victim honest and straightforward ‘on the state of the evidence’ before it.”[2] Id.
The prosecutor’s argument in this case was not infected with the expression of personal belief that we found improper in State v. Ramos, 579 So.2d 360 (Fla. 4th DCA 1991). There, the prosecutor argued to the jury: “And Susan [witness] testified, I believe she testified totally truthfully to you.” Id. at 362 (emphasis added). Unlike the prosecutor in Ramos, the prosecutor in this case did not argue credibility by injecting into the case her personal belief in Dingle’s credibility.
We close by noting that a prosecutor’s closing argument is not limited to a “flat, robotic recitation[] of ‘just the facts.’” Diaz v. State, 797 So.2d 1286, 1287 (Fla. 4th DCA 2001). To the contrary, a prosecutor may robustly and vigorously argue the truthfulness of a witness whose credibility is under attack. As we wrote in Diaz,
[w]e have great confidence in the common sense of jurors to decide cases on the law and facts without being unduly swayed by the lawyers’ oratory. A prosecutor does not violate her obligation to seek justice by arguing the state’s case with passion and conviction.

Id.

III. Code of Silence Testimony
In his second argument, Jackson contends that the trial court abused its discre *1020 tion in admitting testimony from Detectives Myers and Hardiman on the general reluctance of residents of the neighborhood in which the shooting occurred to cooperate with law enforcement. Jackson views the testimony as irrelevant and prejudicial expert opinion testimony on the character of the neighborhood.
A trial court’s decision on the relevance of evidence will not be overturned absent an abuse of discretion, though the court’s decision is limited by the rules of evidence. Deville v. State, 917 So.2d 1058, 1059 (Fla. 4th DCA 2006). Three sections of the evidence code provide the framework for evaluating questions of relevance. The general rule is that “[a]ll relevant evidence is admissible, except as provided by law.” § 90.402, Fla. Stat. (2007). “Relevant evidence is [defined as] evidence tending to prove or disprove a material fact.” § 90.401, Fla. Stat. (2007). Section 90.403, Florida Statutes (2007), establishes a limitation on the introduction of relevant evidence: “Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.”
The “neighborhood code of silence” testimony at issue often arises in prosecutions involving crimes occurring in prison or stemming from gang activity, but also in cases where victims or witnesses are generally reluctant to cooperate with law enforcement. It is relevant on the issue of a witness’s credibility and to explain why witnesses may have given conflicting statements concerning a crime. See United States v. Montes-Diaz, 208 F. App’x 565, 566 (9th Cir.2006) (holding that trial court did not abuse its discretion in admitting testimony on inmate code of silence “to show witness bias and help explain why the government failed to call certain witnesses”); People v. Trujillo, 2002 WL 31474459 (Cal.Ct.App.2002) (unpublished) (holding that expert testimony from a detective “about the reluctance of witnesses [residents of gang neighborhoods] to testify in cases involving gang activity” is relevant to the credibility of a witness); People v. Skinner, 53 P.3d 720, 724 (Colo.Ct.App.2002) (holding that witnesses—the -victim and chief investigator— could offer testimony on an inmate code of silence and that once testified to, the prosecutor could argue the matter since “[s]uch testimony was relevant to explain why the victim and other inmates had given conflicting statements as to who had committed the assault”); Powell v. State, 714 N.E.2d 624, 629 (Ind.1999) (holding that the lead detective’s testimony that it is not unusual for victims or witnesses of crimes to be reluctant to cooperate with police did not improperly vouch for the truthfulness of victim’s testimony).
Code of silence testimony may properly be the subject of expert testimony where a law enforcement agent’s opinion is based on specialized knowledge derived from training or experience and beyond the understanding or experience of the average juror. See § 90.702, Fla. Stat. (2010) (allowing expert testimony on evidence at trial “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue”); United States v. Hankey, 203 F.3d 1160, 1167-69 (9th Cir.2000) (involving the testimony of a law enforcement expert who opined, in part, that “gangs enforce a code of silence among their members”); People v. Martinez, 113 Cal.App.4th 400, 7 Cal.Rptr.3d 49, 59 (2003) (holding that a gang expert could testify on “what it meant to be a ‘rat’ in gang culture” because “it was relevant to help understand discrepancies between some of the wit *1021 nesses’ statements to the police and their testimony at trial”); Edge v. State, 275 Ga. 311, 567 S.E.2d 1, 3 (2002) (holding that “an expert in the field of gangs and gang codes of behavior,” including the “requirements of members’ obedience, silence, and staunch defense of other gang members, and the punishment meted out to a gang member who violates these requirements,” could testify because “[t]hese were factual matters outside the experience of the average juror”).
The testimony of Detectives Myers and Hardiman was relevant to the issue of the credibility of the state witnesses, especially Dingle, and consistent with the testimony of the witnesses themselves, who talked about their reluctance to be seen cooperating with the police.[3] The detectives’ testimony tended to prove that Dingle was credible in that it explained the inconsistencies in her statements. See Lawhorne v. State, 500 So.2d 519, 520 (Fla.1986) (“The credibility of witnesses is always in issue.” (citing Charles W. Ehrhardt, Florida Evidence § 401.1 (1984 ed.))). The probative value of the testimony was not outweighed by its prejudicial effect. This is especially so when compared to the cases approving such testimony in the context of gang activity, where, like the witness, the defendant is a member of the gang. Moreover, in the above cases, there is usually something more — such as an express code of silence and a legitimate fear of retaliation — than the general reluctance to speak truthfully here. In those circumstances, the testimony, unlike the testimony here, is more likely to suggest the culpability of the defendant by reference to something other than the facts of the charged crime.
This case is distinguishable from Wimberly v. State, 41 So.3d 298 (Fla. 4th DCA 2010), where we found certain statements by the prosecutors in closing argument to be “improper and objectionable.” Id. at 302. In a case where the prosecution had problems with its witnesses’ memories, one prosecutor argued that the neighborhood where a shooting occurred was a “close community” where people “want to protect each other” and “certainly don’t want to talk to police.” Id. We found this argument was “improper for the reason that these comments were completely unsupported by any evidence at trial.” Id.; accord United States v. Price, 346 F. App’x 796, 803-04 (3d Cir.2009) (holding improper a prosecutor’s comments on the character of a neighborhood and its inhabitants where there was no supporting evidence); Flowers v. State, 858 A.2d 328, 331-32 (Del.2004) (holding that prosecutor’s reference to “code of silence” among witnesses to shooting not plain error where argument finds support in record). The instant case involves the admission of evidence that was lacking in Wimberly, Price, and Flowers — here, both the witnesses and the detectives testified about the reluctance of the neighborhood residents of Sixth Street and Rosemary Avenue to openly cooperate with the police.
In arguing that the testimony was unduly prejudicial, Jackson relies on a line of criminal cases that forbids the use, as substantive proof of a defendant’s guilt, of testimony about (1) the similarity of a defendant’s conduct to general patterns of criminal behavior or (2) a defendant’s presence in a high crime area. The relied upon cases stand for the proposition that a defendant has the right to be tried on the *1022 evidence against him and not on a theory of guilt by association. See, e.g., Baskin v. State, 732 So.2d 1179, 1180 (Fla. 1st DCA 1999) (“[GJeneral criminal behavior testimony based upon a law enforcement officer’s observations and experience in the investigation of other cases is inadmissible as substantive proof of a defendant’s guilt, because a defendant has a right to be tried based on the evidence against him or her, not on the characteristics or general behavior of certain classes of criminals in general.” (citations omitted)); Dean v. State, 690 So.2d 720, 722 (Fla. 4th DCA 1997) (“This court has repeatedly condemned testimony about behavior patterns of criminals, including drug dealers, based upon an officer’s observations in other cases.” (citations omitted)).
In particular, Jackson relies on a specific application of the principle that, in certain circumstances, forbids testimony on the general characteristics of the neighborhood in which the defendant was arrested. For example, we reversed a conviction for tampering with evidence in the context of a drug charge when “the two arresting officers testified at length about their experience in narcotics arrests and the reputation of the location where the arrest was made as a high crime area” well known for drugs. Johnson v. State, 559 So.2d 729, 729 (Fla. 4th DCA 1990); see also Wheeler v. State, 690 So.2d 1369 (Fla. 4th DCA 1997) (same). Likewise, we reversed a conviction for possession of heroin where the prosecutor stated that the area where the defendant was arrested was known for drug use, and the arresting officer so testified, because “[t]he fact that the policeman knew the scene as being within a reputed narcotics area doesn’t tend to prove anything in issue and could only serve to unduly prejudice the jury.” Beneby v. State, 354 So.2d 98, 99 (Fla. 4th DCA 1978); see also Lowder v. State, 589 So.2d 933, 935 (Fla. 3d DCA 1991) (“In a prosecution for possession of illegal drugs, the fact that a police officer knows that an arrest scene is a reputed narcotics area does not prove anything in issue and is ‘patently prejudicial.’ ” (citation omitted)).
This line of cases is inapplicable here. Unlike those eases, the detectives’ testimony that residents in the neighborhood were often reluctant to cooperate with police was not used to imply Jackson’s guilt by association or his mere presence in the neighborhood. Rather, the testimony was used to address Dingle’s credibility, which was an issue very much in dispute. Thus, the concern underlying cases like Johnson and Beneby is not present in this case.
Finally, this is not a case where the detectives’ testimony improperly bolstered the credibility of another witness. “[A]llowing one witness to offer a personal view on the credibility of a fellow witness” is improper because it “is an invasion of the province of the jury to determine a witness’s credibility.” Knowles v. State, 632 So.2d 62, 65-66 (Fla.1993). An example of the rule’s application is Acosta v. State, 798 So.2d 809 (Fla. 4th DCA 2001). There, we held improper a detective’s testimony that everything a state’s witness told him “appeared to be truthful.” Id. at 809. Further, in Essex v. State, 917 So.2d 953 (Fla. 4th DCA 2005), we held that a detective’s opinion on the consistency between two other witnesses’ testimonies was inadmissible. The detectives in this case did not cross the line. Neither opined that Dingle was truthful, honest, or credible. Their testimonies were not comments about Dingle; they were in the nature of factual background relevant to the evaluation of Dingle’s testimony.
We have considered the remaining point on appeal and find no abuse of discretion *1023 in the trial court’s denial of the motion for mistrial.

Affirmed.

WARNER and STEVENSON, JJ„ concur.

. In her closing argument, the prosecutor emphasized that people in the neighborhood where the shooting occurred were reluctant to cooperate with law enforcement, for fear of being labeled a snitch or rat and life being made more difficult as a result of the label. This was a theme that the State also explored during its opening statement. Jackson did not object to any of these comments.

. Similarly, a prosecutor may call the defendant or a witness a liar when “it is understood from the context that the charge is made with reference to testimony given by the person thus characterized, the prosecutor is merely submitting to the jury a conclusion that he is arguing can be drawn from the evidence.” Craig v. State, 510 So.2d 857, 865 (Fla. 1987). On that basis, in Craig, the Supreme Court found not improper the prosecutor’s "repeated references to defendant’s testimony being untruthful and to the defendant himself as a 'liar.' " Id.

. We note that Jackson never argued below, and does not argue here, that the detectives were not qualified to give expert testimony. Anyway, it is clear from their testimony that each had extensive experience with the neighborhood. See § 90.702 (expert witness is one "qualified as an expert by knowledge, skill, experience, training, or education”).