# Supreme Court of Florida

_____

No. SC15-2395
_____

**DONTAE R. MORRIS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[January 11, 2018]

PER CURIAM.

Dontae Morris appeals his conviction of first-degree murder and sentence of death.[1]  For the following reasons, we affirm the conviction but vacate his sentence and remand for a new penalty phase.

## I.  BACKGROUND

Morris was convicted and sentenced to death for the May 18, 2010, first-degree premeditated murder of Derek Anderson.  The evidence at trial established that on May 18, 2010, at approximately 11:20 p.m., twenty-one-year-old Derek

_____

1.  We have jurisdiction.  See art. V, § 3(b)(1), Fla. Const.

Anderson was walking home with a friend, Joe Anderson, when they noticed a white car following them. Joe testified that as they reached the entrance to Derek's apartment complex, the white car drove by them slowly at about five miles per hour and that he saw four males in the car looking at him and Derek. Joe and Derek then parted ways, and Joe watched Derek walk across the apartment complex's parking lot towards the apartment where Derek lived with his mother. Joe proceeded to walk back to his home.

Shortly thereafter, while Joe was walking home, he called Derek's mother's cell phone to check on Derek. Derek answered the phone and appeared to be all right, but the call ended in static. Joe called the number back, and someone answered the phone. Joe heard screams and raised voices. Joe ran home to talk to his parents and then back to Derek's apartment where he found police officers and neighbors crowded by Derek's body in front of Derek's apartment door.

Police Officer John Simpkins was the first officer to arrive on the scene. Officer Simpkins testified that at 11:31 p.m. he received a dispatch to respond to Derek's apartment complex and was advised that someone had been shot. He arrived at the scene one minute later to find Derek on the ground in front of his apartment door with a bloodstain on his shirt. Derek was not breathing and did not have a pulse, so Officer Simpkins began CPR. Officer Dennis Small arrived on the

scene and helped Officer Simpkins with CPR until Tampa Fire Rescue EMS arrived and transported Derek to the hospital.

Officer Small followed Derek to the emergency room, where trauma surgeons and nurses attempted to revive him. Despite the doctors' and nurses' efforts, Derek was pronounced dead at 12:33 a.m. Derek had no exit wounds, so Officer Small asked Dr. Shapiro to remove any projectiles from Derek's body for evidentiary purposes. Officer Small witnessed Dr. Shapiro remove a bullet from Derek's right pectoral muscles.

Dr. Mary Mainland testified that an autopsy revealed that Derek's cause of death was a single gunshot wound to his back with the bullet perforating his heart, aorta, esophagus, and lungs. The bullet had an upward trajectory from the entrance wound to where it was located in Derek's right pectoral muscles. The gunshot wound caused Derek to bleed to death within seconds or minutes.

Yolanda Soto, a firearm and toolmaking examiner with the Florida Department of Law Enforcement, compared the projectile taken from Derek's body with two projectiles that came from a firearm Morris fired forty-two days after Derek was shot. Ms. Soto testified that all three projectiles were fired from the same firearm.

Tamora Dorn, Derek's sister, lived in the same apartment complex as Derek but in a different apartment unit. Ms. Dorn testified that on May 18, 2010, at

around 11:30 p.m., she had her apartment door open because she was cleaning, and she heard a gunshot. She walked outside of her apartment and saw people scuffling outside. She spoke with someone briefly and then ran towards her mother's apartment. As she approached the apartment, she could see Derek's body and hear her mother. She also confirmed that Derek did not own a phone and would sometimes use his mother's phone.

Cordelia Fisher, a neighbor, testified that around 11:30 p.m. on May 18, 2010, she was in her apartment and heard a gunshot. She looked out her window and saw four black men, whom she did not recognize, running toward a white car that was in the parking lot. She saw the men get in the car and drive away.

Willieshia Jones, Derek's friend who lived near the apartment complex, testified that between 11:00 and 11:30 p.m. she was in the apartment's park area when she heard a gunshot. She saw people running toward the back of the apartment complex. She followed the crowd and saw Derek's body. When she turned to walk away from the area, she saw a white car pull out of the parking lot.

Ashley Price testified that she was friends with Morris. They were intimate on one occasion, but after that encounter remained friends and talked on the phone but were not romantically involved. Morris called Ashley on the phone almost daily to confide in her. Also, Ashley stated that she had previously lived in the

- 4 -

same apartment complex as Derek, and she knew Derek sold marijuana in the apartment complex.

A few days after Derek's murder, Morris called Ashley and told her that he murdered Derek. Morris told Ashley that earlier on the day of Derek's murder, he and Derek had an argument, which almost turned physical, over Derek selling marijuana on Morris' "turf," and Derek told Morris that he would continue to sell marijuana wherever he wanted. Later, around midnight on the same day, Morris saw Derek walking inside the apartment complex. Morris followed Derek from a distance, so Derek would not realize he was being followed. When Derek was in front of his second-floor apartment door talking on the phone, Morris stood on a knee-high wall in the first-floor breezeway and shot Derek in the stomach area. According to Morris, Derek fell to the ground immediately. Morris told Ashley that he knew where to shoot a person to kill him.

Photographs of the apartment building where Derek was shot show that there is a knee-high wall directly below Derek's second-story apartment and that there is a large rectangular open space in the middle of the second floor, allowing a person on the first floor to see the area by Derek's front door. During the investigation, a detective stood on the wall and had a clear view of the location where Derek was shot. Additionally, when Ashley was interviewed, law enforcement had not released any information about Derek being on the phone when he was shot.

On June 2, 2010, Detective Henry Duran placed a call to a phone number associated with Morris and spoke with Morris, who identified himself. Detective Duran subsequently heard Morris' voice in person and on recordings of jail phone calls and testified that he had no doubt that Morris was the person who answered the phone on June 2, 2010. Cell phone records for that phone number revealed that on the date of Derek's murder, the phone was utilizing cell phone towers located near the murder scene. Notably, at 11:30 p.m. the cell phone used a tower one-third of a mile away from the crime scene.

Following the State's case, Morris rested without presenting any evidence or calling any witnesses in his defense. Morris argued during closing arguments that the circumstantial evidence did not prove his guilt beyond a reasonable doubt and that Ashley was not a credible witness. Morris' counsel pointed out that Ashley testified that Morris told her that he shot Derek in the stomach, while the autopsy showed that Derek was shot in the back. Ultimately, the jury found Morris guilty of first-degree premeditated murder.

At the penalty phase, the State presented evidence that Morris was convicted of the first-degree murder and attempted robbery with a firearm of Rodney Jones. The State also presented evidence that Morris was convicted of the first-degree murders of Officers Curtis and Kocab. Additionally, Derek's mother wrote a victim impact statement, which was read for the jury. In mitigation, Morris

presented testimony from his aunt, his son's mother, and a woman he helped take to the hospital after she broke her ankle. On July 30, 2015, the jury recommended the death penalty by a vote of ten to two.

On December 4, 2015, the trial court sentenced Morris to death in accordance with the jury's recommendation. The court found a single aggravator: Morris was previously convicted of another capital felony or a felony involving the use or threat of use of violence to a person (great weight). The trial court found twenty-two mitigating circumstances.

## II. ANALYSIS

On appeal, Morris raises six issues, namely three guilt phase issues, two penalty phase issues, and the proportionality of his sentence. Because we remand for a new penalty phase, we do not discuss his penalty phase claims. We also independently review whether there is sufficient evidence to support Morris' conviction.

### A. Motion to Reconsider Change of Venue

Morris first argues that the trial court erred when it granted the State's motion for reconsideration of defendant's motion for change of venue. However, we conclude that the trial court did not abuse its discretion.

Morris' motion for change in venue was related to media attention regarding other crimes Morris was associated with. Aside from this case, Morris was also

charged with the murders of four other people: Rodney Jones, Officer Curtis, Officer Kocab, and Harold Wright. The murders occurred within weeks of Derek's murder and resulted in a massive manhunt for Morris. Morris was first tried for the murder of Rodney Jones. Due to the media attention surrounding the murders of Officers Curtis and Kocab, the jury for the Jones murder trial had to be selected in Orlando and transported to Hillsborough County, where the trial took place. The parties proceeded with the understanding that the change in venue applied to all of Morris' trials, and the jury was selected following the same procedure for the trial for the murders of Officers Curtis and Kocab. Then, in the present case, the State filed a motion for the trial court to reconsider the change of venue for Derek's murder trial, arguing that a change of venue was no longer necessary because a sufficient amount of time had elapsed since the murders occurred and the media coverage had "dissipated considerably." The trial judge ruled in favor of the State, ordering that it was appropriate to first try to empanel a jury in Hillsborough County before requiring a change in venue.

In Henyard v. State, 689 So. 2d 239, 245 (Fla. 1996), we stated the following when upholding a trial court's ruling denying a motion for change of venue based on pretrial publicity:

> In McCaskill v. State, 344 So. 2d 1276, 1278 (Fla. 1977), we adopted the test set forth in Murphy v. Florida, 421 U.S. 794 (1975), and Kelley v. State, 212 So. 2d 27 (Fla. 2d DCA 1968), for determining whether to grant a change of venue:

Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue. The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom.

Id. at 1278 (quoting Kelley, 212 So. 2d at 28).  See also Pietri v. State, 644 So. 2d 1347 (Fla. 1994), cert. denied, 515 U.S. 1147 (1995).  In Manning v. State, 378 So. 2d 274 (Fla. 1980), we further explained:

An application for change of venue is addressed to the sound discretion of the trial court, but the defendant has the burden of . . . showing that the setting of the trial is inherently prejudicial because of the general atmosphere and state of mind of the inhabitants in the community.  A trial judge is bound to grant a motion for a change of venue when the evidence presented reflects that the community is so pervasively exposed to the circumstances of the incident that prejudice, bias, and preconceived opinions are the natural result.  The trial court may make that determination upon the basis of evidence presented prior to the commencement of the jury selection process, or may withhold making the determination until an attempt is made to obtain impartial jurors to try the cause.

Id. at 276 (citation omitted).  Ordinarily, absent an extreme or unusual situation, the need to change venue should not be determined until an attempt is made to select a jury.

As in Henyard, the prospective jurors in this case were questioned regarding whether they knew anything about the defendant in the case or were exposed to pretrial publicity.  Numerous prospective jurors responded affirmatively, and they

- 9 -

were each questioned individually. Potential jurors who stated that they were familiar with Morris' other murder cases were struck for cause. Of the twelve jurors selected, ten did not recognize Morris' name and two recognized his name but did not have any knowledge of his other crimes. The fact that defense counsel did not or could not ask about Officers Curtis or Kocab is not a basis for overturning the conviction.

Furthermore, Morris' contention that the jurors' memories were jogged during the penalty phase when the facts and circumstances of the officers' murders was presented is speculation. Morris presumes that once those jurors' memories were jogged, they would then possess such prejudice that would prevent them from being impartial. However, "[t]he mere existence of extensive pretrial publicity is not enough to raise the presumption of unfairness of a constitutional magnitude," and "qualified jurors need not be totally ignorant of the facts and issues involved in a case." Bundy v. State, 471 So. 2d 9, 19-20 (Fla. 1985). Here, although there was significant pretrial publicity, the record demonstrates that the jury members "did not possess such prejudice or extensive knowledge" regarding Morris' other charges to require a change of venue. See Henyard, 689 So. 2d at 246; cf. Manning, 378 So. 2d at 276-77 (holding "that the general atmosphere in this rural community was sufficiently inflammatory to require the trial court to grant a change of venue, and his failure to do so constituted an abuse of discretion," when

"[e]very member of this prospective jury had knowledge of exparte statements of the evidence against the accused," and the record showed "that hostility existed in the community against the accused to the extent that it would be difficult for any individual to take an independent stand adverse to this strong community sentiment").

Accordingly, we conclude that the trial court did not abuse its discretion.

**B. Spontaneous Statements While Under Observation in Jail**

Next, Morris asserts that the trial court erred in overruling his objection to the admission of his redacted statement, "I repent for killing," that he made while under observation in jail and that the trial court erred by not allowing him to present evidence regarding his mental state at the time he made the statement. However, we conclude that the trial court did not abuse its discretion in admitting the redacted statement and that any error in preventing the defense from presenting evidence was harmless beyond a reasonable doubt.

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. Franklin v. State, 965 So. 2d 79, 94 (Fla. 2007). Under Florida law, all relevant evidence, defined as that tending to prove or disprove a material fact, is admissible unless otherwise provided by law. See §§ 90.401–.402, Fla. Stat. Relevant evidence is inadmissible, however, where the

probative value is substantially outweighed by the danger of unfair prejudice.  See § 90.403, Fla. Stat.

An admission of a party opponent is admissible as an exception to the hearsay evidence rule.  § 90.803(18), Fla. Stat.  "In the context of a criminal trial, an admission [by] the defendant is admissible if it tends in some way, when taken together with other facts, to establish guilt."  Swafford v. State, 533 So. 2d 270, 274 (Fla. 1988).  The evidence must "be relevant to a material issue other than propensity or bad character."  Johnston v. State, 863 So. 2d 271, 279 (Fla. 2003) (quoting Drake v. State, 441 So. 2d 1079, 1082 (Fla. 1983)).

In Morris v. State, 219 So. 3d 33, 42 (Fla. 2017), we considered the admissibility of this same statement from Morris, "I repent for killing," in a separate trial for the murders of Officers Curtis and Kocab.  We held that the trial court did not abuse its discretion in admitting the statement, reasoning:

> Morris' statement, "I repent for killing," constitutes evidence tending to show that he was involved in the murders.  And because the statement was redacted to take out the reference to killing five people, the statement does not tend to show propensity or bad character.  Moreover, the probative value of Morris' redacted statement is not substantially outweighed by the danger of unfair prejudice.

Id.  For the same reason, the trial court did not abuse its discretion by admitting the evidence here.

Morris also argues that the trial court erred by preventing him from presenting evidence regarding his mental state at the time he made the statement.

In <u>Morris</u>, Morris raised the same issue, and we concluded that the trial court erred by not allowing him to present the evidence, but that the error was harmless beyond a reasonable doubt:

> Pursuant to the Florida Evidence Code, Morris could offer evidence to dispute the truthfulness of his statement and impeach his admission. <u>See</u> § 90.806(1), Fla. Stat. Specifically, the testimony Morris sought to offer was relevant to the circumstances surrounding his statement, namely his mental state at the time he made the statement, in an attempt to cast doubt on the credibility of the statement that he made. <u>See, e.g.</u>, <u>Palmes v. State</u>, 397 So. 2d 648, 653 (Fla. 1981) (defendant's state of mind is relevant to the question of what weight to give the confession in determining guilt). However, any error in excluding evidence of Morris' mental state at the time he made the statement was harmless beyond a reasonable doubt. <u>See</u> <u>State v. DiGuilio</u>, 491 So. 2d 1129, 1138 (Fla. 1986).

<u>Id.</u> In this case as well, the evidence Morris sought to offer, specifically Dr. McClain's testimony regarding his mental state at the time he made the statement, was relevant to the circumstances surrounding his statement and was offered in an attempt to cast doubt on the reliability of his statement. Nevertheless, any error in excluding the evidence was harmless beyond a reasonable doubt. <u>See</u> <u>DiGuilio</u>, 491 So. 2d at 1138.

## C. Prosecutor's Conduct During Opening and Closing Statements

Additionally, Morris contends that he was deprived of a fair trial because the prosecutor made numerous improper comments during the State's opening statement and closing argument. We disagree.

"A trial court has discretion in controlling opening and closing statements, and its decisions will not be overturned absent an abuse of discretion." Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007) (citing Dufour v. State, 905 So. 2d 42, 64 (Fla. 2005)).  To preserve a claim for appellate review, counsel must make a contemporaneous objection, and unobjected-to comments may only be reviewed for fundamental error.  Id.  Fundamental error is error that "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error."  Calloway v. State, 210 So. 3d 1160, 1191 (Fla. 2017) (quoting Brown v. State, 124 So. 2d 481, 484 (Fla. 1960)).

### 1. Opening Statement

a. Witness Credibility

During the State's opening statement, Morris' counsel objected on grounds of improper bolstering when the prosecutor stated that Ashley Price had not been convicted of any felonies at the time she initially contacted the police.  At sidebar, the State explained that they were bringing it up anticipatorily, believing that the defense would bring out Ashley's four felony convictions and probation.  The trial court was within its discretion when it sustained the objection but refused Morris' request for a curative instruction.  See Salazar v. State, 991 So. 2d 364, 372 (Fla.

- 14 -

2008) (stating it is within the trial court's discretion to not give a curative instruction if it believes that doing so would bring more attention to the comment).

b. Epithets

Additionally, Morris argues that it was improper for the prosecutor to refer to him with the use of adjectives such as "cold-blooded," "stone cold," and "ruthless." These claims were not preserved with a contemporaneous objection and do not rise to the level of fundamental error. See Davis v. State, 928 So. 2d 1089, 1127 (Fla. 2005) (concluding that referring to a defendant as "a cagey little murderer. Little robber, cagey little thief," "was not as egregious as in cases where this Court has found fundamental error").

## 2. Closing Argument

a. Witness Credibility

Morris argues that the prosecutor improperly bolstered Ashley's credibility when he described her as "courageous" for coming into court to testify. We conclude that the trial court did not abuse its discretion when it overruled defense counsel's objection to the prosecutor's statement. Moreover, any possible error was harmless. See DiGuilio, 491 So. 2d at 1138.

Additionally, Morris raises unpreserved claims that the prosecutor impermissibly expressed his opinion at other points during closing arguments regarding Ashley's credibility, specifically with discussion of the recorded phone

call, and Joe's credibility by describing him as "this very credible young man." However, we conclude that no error (let alone fundamental error) occurred because "an attorney is allowed . . . to argue credibility of witnesses . . . so long as the argument is based on the evidence." See Jackson v. State, 89 So. 3d 1011, 1018 (Fla. 4th DCA 2012) (quoting Miller v. State, 926 So. 2d 1243, 1254-55 (Fla. 2006)).

Next, Morris asserts that the prosecutor impermissibly shifted the burden during closing argument when he stated to the jury that Ashley had no motive to lie and that "there's been no suggested motive to her cross-examination." However, even if the issue was preserved, there was no error because the State's argument was an invited response in rebuttal to Morris' attack on Ashley's credibility. See Scott v. State, 66 So. 3d 923, 930 (Fla. 2011) ("[U]nder the 'invited response' doctrine, the State is permitted 'to emphasize uncontradicted evidence for the narrow purpose of rebutting a defense argument since the defense has invited the response.' " (quoting Caballero v. State, 851 So. 2d 655, 660 (Fla. 2003))).

Additionally, Morris contends that the prosecutor's assertions of Morris' guilt were impermissible, including statements that Morris was "guilty all day long," and that "there is no doubt," with regards to Morris' guilt. However, defense counsel did not object to any of the comments.

Moreover, even if this issue had been preserved, the State would have carried its burden to show that the error was harmless beyond a reasonable doubt. See DiGuilio, 491 So. 2d at 1138.

b. Recorded Jail Phone Call

Next, Morris raises several issues regarding the prosecutor's discussion of a recorded jail phone call between Morris, Ashley Price, Dwayne Callaway (Morris' stepbrother), Javonte Dennard (Morris' cousin), and Tiffany Price (Ashley's sister and the mother of Dennard's child).

During closing argument, the defense asserted that the phone call demonstrated that Morris only wanted Ashley to tell the truth. In response, the prosecutor argued that Morris was not seeking the truth, and after reviewing over a dozen excerpts from the call stated: "Now, it's pretty clear from that telephone call that the truth is the last thing this defendant is concerned about. And I think that's very clear now." To support this, the prosecutor played numerous sections of the call, pausing at points to urge the jury to consider the evidence and make inferences as to the meaning behind Morris' words in the phone call. Particularly, the prosecutor drew attention to the way Morris talked about the fact that Ashley was speaking to the police, what Morris said when speaking with Ashley, the way Morris complained about having "people on the phone," and the way Morris used the phrase, "You smell me?" throughout the conversation. We conclude that the

argument was proper because the prosecutor reviewed and drew reasonable conclusions from the evidence.  See Dessaure v. State, 891 So. 2d 455, 468 (Fla. 2004) (holding that prosecutor's closing argument was proper when he reviewed the evidence presented and then "explicated reasonable inferences that could be drawn from [the] evidence").

Additionally, Morris asserts that the prosecutor impermissibly invited the jury to convict him for reasons other than guilt of Derek's murder when he stated:

> When a defendant who is sitting in the county jail charged with a capital murder, gets on the phone and calls the most critical witness in the case and tries to do what he tried to do there, that kind of evidence attempts to manipulate, to cover up, to conceal, to get rid of evidence, that kind of critical evidence the heart of the State's case, . . . just drips with guilt.

However, considered in context, the prosecutor was urging the jury to convict Morris because the evidence indicated that he was guilty of Derek's murder and not because of Morris' conduct during the phone call.  Cf. Ruiz v. State, 743 So. 2d 1, 6 (Fla. 1999) ("By characterizing Ruiz as 'Pinocchio' and then telling the jury that 'truth equals justice' and 'justice is that you convict him,' the prosecutor was inviting the jury to convict Ruiz of first-degree murder because he is a liar."); Northard v. State, 675 So. 2d 652, 653 (Fla. 4th DCA 1996) (finding State's argument improperly asked the jury to "determine who was lying as the test for deciding if [defendant] was not guilty").  Thus, we hold that the prosecutor did not suggest an improper basis to convict Morris in this case.

Furthermore, Morris contends that the prosecutor suggested that Morris was the unquestioned leader of a drug enterprise during his commentary on the recorded phone call. However, we conclude that the nonrecord implication regarding the extent of Morris' illegal drug enterprise does not rise to the level of fundamental error. See Gonzalez v. State, 136 So. 3d 1125, 1140 (Fla. 2014) ("Fundamental error is error that reaches 'down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.' " (quoting Spencer v. State, 842 So. 2d 52, 74 (Fla. 2003))).

### 3. Cumulative Error Analysis

We identified two aspects of the prosecutor's statements that raise concern: (1) his use of epithets; and (2) the nonrecord implication regarding the extent of Morris' drug enterprise. Assuming these comments to be improper, we determined that neither of these issues individually amounted to fundamental error. Moreover, the cumulative effect of these errors did not deprive Morris of a fair trial. See Braddy v. State, 111 So. 3d 810, 843 (Fla. 2012).

Although the prosecutor may have crossed the line by referring to Morris as "cold-blooded," "stone cold," or "ruthless," and asserting Morris' guilt, when the comments are viewed in full context of the trial, they were not sufficient to vitiate Morris' right to a fair trial. Furthermore, the prosecutor's statement implying that

- 19 -

Dennard, Callaway, and Tiffany may have been involved in Morris' illegal drug operation was not central to the State's case against Morris for Derek's murder. See id. ("[B]ecause the evidentiary issue . . . does not lie at the core of the State's case against Braddy, any comments regarding that minor piece of evidence cannot be said to have prejudiced Braddy in any significant way."). Accordingly, we hold that the cumulative effect of the errors in the State's argument did not compromise the integrity of Morris' trial.

## D. Sufficiency of the Evidence

Although Morris did not raise this issue, we have "a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed." Miller v. State, 42 So. 3d 204, 227 (Fla. 2010). We review the evidence in the light most favorable to the State to determine whether "a rational trier of fact could have concluded that the elements of the crime have been proven beyond a reasonable doubt." Jeffries v. State, 222 So. 3d 538, 546 (Fla. 2017).

Applying this standard, we conclude that competent, substantial evidence supports Morris' conviction for first-degree murder. For example, Ashley Price testified that a few days after Derek's murder, Morris called her and confided in her that he killed Derek. Morris told Ashley that earlier on the day of Derek's murder, he got into an argument with Derek because Derek was selling marijuana

on Morris' "turf." Morris said that on the night of the murder, he saw Derek walking to his apartment. Morris followed Derek from a distance. When Derek got to his front door on the second floor, Morris stood on a knee-high wall on the ground floor and shot Derek in the stomach area.

Additionally, the State presented evidence at trial that Morris' cell phone was using cell phone towers near the murder scene around the time of the murder. Significantly, at 11:30 p.m., Morris' cell phone used a tower that was one-third of a mile away from the crime scene.

Moreover, Yolanda Soto, a firearm and toolmark examiner, testified that she examined the projectile that killed Derek and two other projectiles that Morris shot from a firearm forty-two days after Derek's murder. Ms. Soto testified that all three projectiles were fired from the same firearm. Accordingly, competent, substantial evidence exists to support Morris' first-degree murder conviction.

## E. **Hurst**

Finally, Morris argues that Hurst error is not harmless and requires this Court to reverse his death sentence. We agree, vacate his death sentence, and remand for a new penalty phase.

During the pendency of Morris' appeal, the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616, 619 (2016), in which it held that Florida's former capital sentencing scheme violated the Sixth Amendment

because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty," even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." On remand in Hurst v. State, 202 So. 3d 40 (Fla. 2016), cert. denied, 137 S. Ct. 2161 (2017), we held:

> [b]efore the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

202 So. 3d at 57. We also concluded that Hurst "error is capable of harmless error review," explaining:

> The harmless error test, as set forth in Chapman[v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

Id. at 68 (quoting DiGuilio, 491 So. 2d at 1138).

Because the jury in this case recommended death by a vote of ten to two, we "cannot determine that the jury unanimously found that the aggravators outweighed the mitigation." Kopsho v. State, 209 So. 3d 568, 570 (Fla. 2017). "We can only determine that the jury did not unanimously recommend a sentence of death." Id. Therefore, because we cannot say that there is no possibility that the

error did not contribute to the sentence, the error in Morris' sentencing was not harmless beyond a reasonable doubt. Therefore, we vacate the death sentence and remand for a new penalty phase.

### III. CONCLUSION

For the foregoing reasons, we affirm Morris' conviction for first-degree murder, vacate his sentence of death, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
CANADY and POLSTON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring specially.

I fully concur in that portion of the opinion affirming Morris's conviction and concur specially in the reversal of Morris's death sentence. See Okafor v. State, 225 So. 3d 768, 775-76 (Fla. 2017) (Lawson, J., concurring specially).

An Appeal from the Circuit Court in and for Hillsborough County,
    William Fuente, Judge - Case No. 292010CF010373000AHC

Howard L. "Rex" Dimmig, II, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Marilyn Muir Beccue, Assistant Attorney General, Tampa, Florida,

for Appellee