DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT
_____

JERRY WAYNE ANDREWS,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D2022-1981

_____

May 15, 2024

Appeal from the Circuit Court for Sarasota County; Donna M. Padar, Judge.

Andrea Flynn Mogensen of Andrea Flynn Mogensen P.A., Sarasota, for Appellant.

Ashley Moody, Attorney General, Tallahassee, and David Campbell, Assistant Attorney General, Tampa, for Appellee.

LaROSE, Judge.

Jerry Wayne Andrews appeals his judgment and sentences for sexual battery on a victim under twelve years old, § 794.011(2)(a), Fla. Stat. (2017-2019), and for distributing obscene material to a minor, § 847.0133(1), Fla. Stat. (2017-2019).  *See generally* Fla. R. App. P. 9.030(b)(1)(A) (providing jurisdiction for appeals of final judgments).  Mr. Andrews argues that the trial court erred in (1) not holding a *Franks*[1]

---

[1] *Franks v. Delaware*, 438 U.S. 154 (1978).

hearing, (2) denying his motion to suppress, (3) admitting into evidence over 7,119 Uniform Resource Locators (URLs)[2] for pornographic websites, and (4) denying his motion for judgment of acquittal (JOA) as to the distribution of obscene material count.  Finally, Mr. Andrews argues that the prosecutor's closing argument constituted fundamental error.  Alas, his arguments fail.  We affirm.

## I.    MATERIAL FACTS

### 1.  The Offenses

The Department of Children and Families (DCF) reported to law enforcement officers that a child alleged that Mr. Andrews showed her pornography and directed her to perform oral sex on him.

The Child Protection Team (CPT) interviewed the child.  The child promised to tell the truth during the interview.  The interviewer asked the child what she told DCF.  The child replied, "I sucked [Mr. Andrews'] dick."

The child added that this happened a "handful" of times.  It first happened when she visited Mr. Andrews' house.  The child was watching a movie on Mr. Andrews' laptop.  "And it all started whenever the glitch came."  The interviewer asked, "What's the glitch?"  The child explained that a "video popped up" of "[a] girl sucking a guy's dick."

The child reported that Mr. Andrews and she both saw it. According to the child, Mr. Andrews told her that "he wanted [her] to do that" to him.  The interviewer asked if she did.  The child replied, "Every time."  Afterwards, Mr. Andrews gave her a dollar.  Mr. Andrews also told

---

[2] Mr. Andrews inaptly states throughout his appellate briefs that the trial court admitted 7,129 URLs.  But one of the exhibits that Mr. Andrews contests lists the total number as 7,119.  The remainder of the exhibits at issue list over 500 URLs.

her that if she told Mr. Andrews' then-wife, C.S., what happened, she would get in trouble with C.S.

The interviewer again asked about the glitch. The child mentioned Elsa, a Disney character from the Frozen motion picture. The child stated, "Els – it's the same thing. Elsa sucking his dick. . . ." The child reported that Mr. Andrews was always present when the glitch happened. The child said, "He -- he would try to get it to fix . . . ." Apparently, Mr. Andrews would try to fix it by "[t]rying to get it away. Like, he would delete the videos, but nope." The child did not know if Mr. Andrews pulled up the videos himself. Mr. Andrews told her that the videos "just came up," and she believed him.

A law enforcement detective submitted a search warrant affidavit and application for the contents of Mr. Andrews' laptop. The affiant alleged, in pertinent part, as follows:

> 1.  . . . I received a report from [DCF] . . . [alleging that the child] disclosed to her family and DCF that [Mr. Andrews] showed her videos of girls "sucking guys' dicks." The [child] went on to advise that one of the videos included the Disney characters "Elsa and Olaf" performing oral sex on each other and [Mr. Andrews] wanted her to do that to him.
>
> . . . .
>
> 7.  During the CPT [interview], [the child] stated videos of girls sucking guy's [sic] dicks would pop up on the computer and [Mr. Andrews] told her he wanted her to do that to him. [The child] explained there was also a video containing Elsa and Olaf (characters from the child's movie Frozen) and they were sucking dicks . . . . [The child] stated she would watch the videos on [Mr. Andrews'] computer.
>
> . . . .

10. The suspect's wife, [C.S.], brought a computer to the Sheriff's Office because she believes it contains illegal material and evidence.

. . . .

12. Your Affiant knows through his training and experience that these images/videos that depict child sexual exploitation material often reside within numerous places within electronic devices and with the proper tools can be recovered via digital forensic techniques even when deleted by the user(s).

The trial court issued a search warrant.

Upon execution of the warrant, law enforcement officers discovered "[w]ebsites involving pornographic Disney characters" in the search browser's history. The officers arrested Mr. Andrews. The offenses occurred on or between March 1, 2017 and November 23, 2019.

## 2. Pretrial Proceedings

The State wanted to introduce at trial the child's statements made during the CPT interview. Defense counsel asked the trial court to exclude all evidence obtained from Mr. Andrews' laptop. She claimed that the search warrant affidavit omitted relevant facts and contained false statements. Defense counsel also asked for a *Franks* hearing. She argued that the affiant misled the issuing magistrate by falsely stating that Mr. Andrews "showed" the child pornographic materials. The child, according to defense counsel, explicitly stated that Mr. Andrews did not intentionally show the child the videos; the affiant excluded material information that the videos popped up because of a glitch that Mr. Andrews tried to fix.

The trial court held a five-day hearing on those motions. Beginning with the child hearsay matter, the parties called many witnesses. At the State's request, the trial court admitted a video of the CPT interview into evidence. The trial court announced that it would address the search

4

warrant issue the following week. It asked the parties to have witnesses on standby. Defense counsel asked the trial court to take judicial notice of the CPT interview video so they would not have to hear it again. Defense counsel did not want to "duplicate the evidence."

On the next hearing date, defense counsel addressed the search warrant matter. She disclaimed the need for the affiant's testimony; the trial court had "the four corners of the affidavit" and "heard the testimony on the CPT tape." When asked by the trial court whether the parties needed other witnesses, neither counsel requested the attendance of witnesses. Indeed, defense counsel stated:

> So I'm going to ask the Court to take judicial notice of all the testimony you've heard. You have the CPT transcript, and you can see all the things that [the child] did not say, that were omitted from this warrant and purposely excluded and instead made it sound like [the child] said, [Mr. Andrews] showed me pornographic movies on this computer. And those are recklessness regard [sic] for the truth.

Ultimately, the trial court denied the motion to suppress. The trial court "was already very familiar with the details of this case from having conducted a multi-day [sic] extended evidentiary hearing on the admission of the child's three proffered hearsay statements." The trial court "had heard testimony from the child, various family members, law enforcement, and defense experts and had viewed the CPT video." The trial court found "that the information contained in the affidavit . . . properly summarized the facts as they were then known to the affiant/detective" and that the child consistently asserted "that when the videos 'popped up,' [Mr. Andrews] took advantage of the situation and told her [what] he wanted her to do to him." The trial court determined that Mr. Andrews failed to make "a substantial preliminary showing that the affiant made an intentionally false or reckless statement in the

5

affidavit for the search warrant for [the laptop] or that any significant fact was omitted that was necessary to a finding of probable cause."

**3. The Trial**

Before the trial court swore in the jury, defense counsel moved to exclude a report listing over 7,100 URLs of pornography, claiming undue prejudice. She advanced a multiprong argument: there was no evidence that anyone watched the videos; watching pornography is not illegal; there is no probative value to telling the jury *the number* of URLs found on the laptop; C.S. would testify that she and Mr. Andrews watched pornography; and some of the URLs "are not relevant." The State responded that about 476 of the URLs were related to Disney characters. Thus, the URLs were relevant to establish that Mr. Andrews showed obscene material to a minor. The State also emphasized a history of deletions from the laptop during the relevant period.

The trial court denied Mr. Andrews' motion. Defense counsel declined the trial court's offer of a special instruction about the legality of pornography.

The trial court admitted a video of the CPT interview into evidence. The CPT interviewer testified that she conducted the forensic interview, "a structured interview conducted for investigative purposes in a manner that elicits the most reliable information." The interviewer had asked the child open-ended questions "[s]o as not to influence the child."

The child also testified. She stated that bad movies came up while she was on the laptop with Mr. Andrews. She explained that there were adults in the movies having sex. She did not remember if the adults looked like Elsa or Olaf. The child testified that the movies came on automatically "like an ad." The child told the jury that Mr. Andrews asked her to "[s]uck his dick." She could not recall how many times.

6

The child testified that Mr. Andrews told her to keep it a secret. The child also said that Mr. Andrews gave her ten dollars after it happened; she did not recall if he gave her a different amount.

On cross-examination, the child admitted that she used to lie a lot; she had told the CPT interviewer the same thing. She admitted that she lied about getting beat up in a school fight. She testified that she told her family that Mr. Andrews made her perform oral sex while people were swimming, but that never happened. Defense counsel asked, "So now today you're telling us that [Mr. Andrews] made you do this twice, right?" The child replied, "Yes." The child admitted that it was not true when she told the CPT interviewer that it happened more than twice. The child recalled that the first time it happened, she was playing with toys. The child testified that she remembers telling defense counsel that the movies did not happen on the same day that Mr. Andrews made the child "do it."

On redirect, the child testified that she sometimes has a hard time remembering what she said before. The child testified that Mr. Andrews did not show her movies, but that he was present when the movies popped up. When asked if Mr. Andrews told her "[t]hat's what I want you to do to me," the child could not remember.

Defense counsel asked on recross-examination if the child remembered saying anything to C.S. about whether Mr. Andrews showed her movies. The child replied, "No."

A family member testified that the child told her about the glitch. The child told this witness that she had seen other pornographic videos "of Elsa and Olaf and cartoon ones where they were doing the same thing. [The child] said that [Mr. Andrews] was saying that what they were doing in those videos is what he wanted her to do to him."

7

The family member testified that the child later admitted to her that she told C.S. that Mr. Andrews did not show her any videos and that she lied. The child did not know why.

C.S. testified that she was married to Mr. Andrews at the time of the alleged offenses. C.S. testified that they were having marital issues. They sold their home and were now divorced.

C.S. testified that she and Mr. Andrews watched pornography on the Firefox internet browser so their son would not see it. She testified that Mr. Andrews told her that he did not like cartoon pornography and, contemporaneously, showed her such content.

C.S. testified that she confronted Mr. Andrews with the child's allegations. Mr. Andrews took her to the laptop, opened the browser, and pulled up a pornographic movie related to Elsa or Disney. C.S. was surprised because Mr. Andrews previously told her that he did not like cartoon pornography. But Mr. Andrews said it was "adults dressed up like Disney characters." Mr. Andrews admitted to C.S. that it was possible that he looked at Disney pornography while the child visited their home. When Mr. Andrews visited his mother for Thanksgiving, C.S. stayed home, looked at the browser history, found "Elsa or Disney" pornography, and became upset.

C.S. testified that she left their home with the laptop and some of their belongings. Later, Mr. Andrews asked her to return his stuff, including his passport. He talked to her about fleeing the county and avoiding extradition. They owned a boat.

C.S. testified that she later spoke to the child, together with her son. C.S. testified that she asked the child several times about the videos. C.S. testified that, while crying, the child stated that Mr. Andrews did not show her the videos. When asked if the child "did still

8

tell [C.S.], though, that [Mr. Andrews] did force her to perform oral sex," C.S. replied, "She did, but when she explained it to me, she didn't explain the sexual act . . . ."

C.S. was shocked that the child lied about a felony. She admitted that she no longer liked the child. C.S. felt that the child ruined her life. C.S. admitted that she did say she hated the child; she explained that she hated what the child did.

The State's digital forensic expert testified. Defense counsel unsuccessfully moved to exclude the expert's testimony about a gap in the laptop's browser history caused by deletion. Defense counsel argued that such a conclusion was speculative.

Defense counsel then moved to exclude "the introduction or mention of the number of porn sites" found on the laptop. The trial court asked the parties to identify the exhibits at issue; they identified Exhibit 9. Exhibit 9 listed ten URLs, eight of which were non-Disney pornographic videos. The State contended that Exhibit 9 was not overly prejudicial because it was only a summary showing ten URLs. Exhibit 9 also reflected that the expert found 7,119 pornographic websites. The State explained that it did not print out all 7,119 URLs; Exhibit 9 was a summary. The State then showed the trial court Exhibit 7, a multipage excel spreadsheet that listed 496 URLs—including those for Disney and cartoon pornography.

The State argued that the exhibits were relevant to the offense of showing obscene material to a minor because the child stated the pornography was Disney-related. The State also stated that the exhibits were relevant to show the gap in the browser history. Defense counsel asserted that the exhibits were not relevant because there was no evidence that Mr. Andrews ever showed the child anything or clicked on

9

anything, and there was no point to telling the jury that there were over 7,000 pornography sites. Defense counsel stated that the trial court, if anything, could admit Exhibit 7 for the Disney-related URLs but not Exhibit 9. The trial court denied Mr. Andrews' motion.

The digital forensic expert testified that he examined the browser history under Mr. Andrews' laptop profile.[3] The expert found a gap. He testified that he took a screenshot of the gap. The State sought to admit the one-page screenshot into evidence as Exhibit 5. Exhibit 5 listed 39 pornographic URLs. Some mentioned race, teens, and homosexuality. Defense counsel objected, without elaboration. The trial court admitted the exhibit "[s]ubject to any prior objection."

The expert also took a screenshot of the most visited websites on the laptop. The trial court admitted the screenshot as Exhibit 6, "[s]ubject to any prior objection." Exhibit 6 listed the nine most visited websites. They included pornographic URLs mentioning homosexuality, teens, horses, and hentai.[4]

The expert further testified that he determined that it was possible to delete browser history. The State successfully moved to admit the expert's screenshots as Exhibits 10A through 10F, "[s]ubject to all prior objections." Exhibits 10A through 10F were one page each, listing pornographic URLs from the laptop's browser history. The expert explained that the search browser could save up to 86,422 pages of URLs, but that the search browser on Mr. Andrews' laptop only had

---

[3] The expert explained that he found a user profile identifying Mr. Andrews as the owner and user of the laptop.

[4] "The Oxford Dictionary online defines hentai as a subgenre of the Japanese genre of manga and anime, characterized by overtly sexualized characters and sexually explicit images and plots." *State v. Pittman*, 267 So. 3d 672, 675 n.3 (La. Ct. App. 2019).

7,119 URLs.  The trial court admitted Exhibit 9 into evidence, over defense counsel's prior objections.

The expert testified that he searched and generated a report of all the Disney-related pornographic URLs on Mr. Andrews' laptop.  The trial court admitted the report as Exhibit 7, over defense counsel's prior objections.

On cross-examination, the expert conceded that when he searched the browser history for "Disney," the search would pull up anything related to Disney.  The expert agreed that pornography is not illegal.  He admitted that he did not know "who was behind the [laptop] when these search terms were entered."

The State rested, and defense counsel moved for a JOA.  The trial court denied the motion:

> In the light most favorable to the State, the Court finds that --
> that, at a minimum, a jury could find that the defendant, as
> the State said, used it as instructional material, knowing that
> the child saw what was on there; and the pornographic
> nature of it appeared to be readily apparent to both of them;
> and the defendant allegedly commenting that, "That's what I
> want you to do to me."  Whether or not there are additional
> issues with regard to proof is another matter, but the Court
> finds that the State has made a prima facie case, and the
> counts will go to the jury.

After Mr. Andrews presented three witnesses, the parties presented closing arguments.  The prosecutor argued, in pertinent part, as follows:

> If you believe [the child] and what she had told you she woke
> up to at 7:00 a.m. that morning, if you believe [family
> member] and what [the child] told her when she said to her
> without knowing what was said before, what happened,
> what's going on, if you believe what [the child] said to the CPT
> interviewer, when you got to see [the child] not [the child] on
> the stand, not [the child] being questioned and questioned
> and questioned, not the [child] that was cornered by [C.S.]

11

and [C.S.'s son] three times in a row until she sobbed and ended that conversation by saying, "I don't know, I don't know, I don't know," not the [child] who shuts down and goes into robot mode and just wants to get out of this room.

. . . .

Not the [child] who wants to get out of the room where her abuser is staring right at her. If you believe that [child], your job is done. And we talked about that. That is the law in the state of Florida.

But that's not all we have. That's not all you saw. Her story is corroborated by the Disney pornography found on the defendant's laptop. It is also corroborated by the fact that the defendant, when he realized he was being accused of this, tried to cover his tracks by going to his ex-wife and saying, "Let me show you the computer. I actually do look at this, so I know it's there. But, you know, I told you I didn't look at it, but I do. But maybe it was an accident. I don't know." How did she know that? How did she know that?

. . . .

One of the biggest things I want you to focus on about reasonable doubt is it is not a mere possible doubt. It is not a speculative doubt. It is not an imaginary doubt or forced doubt. If you go back and you find yourself saying, "Well, maybe this happened," it's not a reasonable doubt. "Is it possible that this happened," that's not a reasonable doubt. "Well, let's think, because maybe this makes more sense." Now you are forcing and coming up with speculation and imaginary doubt. So, you are not allowed to speculate. You have been given all the evidence that you need for this crime, and that's the only evidence that you are allowed to consider. Please do not engage in speculation.

The prosecutor then discussed C.S.'s questioning of the child. The prosecutor stated how C.S. went from asking the child if she got in trouble at school and why to "Oh, are you the reason I lost my house? Are you the reason I lost my boat?" Defense counsel objected to the argument for assuming facts not in evidence. The trial court agreed.

12

The trial court admonished the prosecutor to rephrase. The prosecutor did so, without objection:

> Let me clarify. [C.S.] did not ask [the child,] "Are you the reason that I lost my house and boat?" That was confusing. I apologize. She was grilling a child, who she testified in front of you that she hated. She then tried to qualify and said, "I don't really hate anyone." No, she said she hated her. In a pretrial hearing, she admitted that. She said she hated her because she took away her life and ruined her life. She also told you she lost the house -- or, that the house had to be sold and the boat had to be sold. They were only in that house for two or three years.
>
> And I don't know if you noticed this, but when [defense counsel] pulled out the pictures of the house, that's when she started to cry. That's her loss. That's why she's here.

The prosecutor concluded closing argument:

> When [the child] testified and I asked her questions, I asked her direct questions, open-ended questions. On cross, and this is the way the law is written, the Defense asks leading questions. Leading questions to a child who, right before your eyes, shut down, went into robot mode, and just went, yeah, right, yeah, right, over and over and over again to get out. The State submits to you that [the child's] testimony on direct with the State is what happened. Her CPT interview, it's the same stuff. You know, in opening the Defense mentioned that the stories were going to be so different. They are not different. And what's really interesting is the Defense even highlighted that with [C.S.]. When she grilled her, she said, "I said never said [Mr. Andrews] showed me any videos." She's actually right. Now, it sounds like she was in a defensive position, but she's a little kid, right? What was it in the CPT? What was it with It was a glitch. It was a pop-up. And in her CPT interview, they said, "Was [Mr. Andrews] there? Did he show them to you?" "I don't know. I don't think so, because I saw him, but I don't know." So she did recant. She's literal. She didn't ever herself say, "[Mr. Andrews] showed me videos." She answered questions about it. But when she was open-asked, open direct questions, her answers were, "glitch, pop-up, maybe an ad." She's actually a credible witness.

13

Ladies and gentlemen of the jury, at the end of your deliberations, after you review all of this evidence -- thank you for your time and attention, by the way. It's been a lot, in various ways. The People of the State of Florida trust you with the law, trust you with the evidence. We trust you that you'll come to the only just verdict, which is guilty of sexually battering and using pornography and showing it to her to make sure she knew what he wanted and how he liked it. Thank you.

On rebuttal, the prosecutor addressed the child's behavior on cross-examination:

And why [the child?] Why the kid with special needs? Why the kid that if she said something, you can pick her apart, you can get her to shut down on cross, you can get her to just give you whatever answer you want because she's afraid and she wants to get off the stand? Because what [C.S.] and what [C.S.'s son] did to her is what was done to her on cross in front of your own eyes. But what's really interesting is, she may have shed a tear, but she wasn't sobbing, and she didn't say, "I don't know, I don't know, I don't know." That's how bad it was with [C.S.] and [C.S.'s son].

. . . .

. . . And I am not asking you to ignore the cross-examination of [the child] by the Defense. Frankly, I'd like you to focus on it a little bit, because what you'll find is every single question had the answer in it, and every single one either ended with "right?" or "yeah?" or "you lied about that, right?" That was every single question to that little girl on cross. I want you to focus on that because that's the only thing the Defense is right about. Because the evidence is there. It corroborates her story. Her story has been consistent. He made her perform oral sex.

The prosecutor attempted to end his rebuttal: "Don't let his plan work. He tried to keep evidence from you by destroying the computer. He tried to keep evidence from you by bribing her parents to get her to not

14

testify." Defense counsel objected to "[i]mproper shifting of burden"; the trial court asked the prosecutor to rephrase. The prosecutor did so:

> Don't let it work. You have the evidence that you need. And [the child] gave you all that you need from her testimony here to her CPT to what her [family member] said to what her [other family member] said and to what she somehow knew at eight years old that was on his computer. He is guilty of all counts.

The jury found Mr. Andrews guilty of both offenses.

## II. DISCUSSION

### 1. Failure to Hold *Franks* Hearing

Mr. Andrews argues that the trial court violated his due process rights by not having a *Franks* hearing. He asserts that the trial court held a "pre-*Franks*" hearing and improperly relied on evidence from a prior hearing on child hearsay. Mr. Andrews tells us that he was not on notice that he had to contest the search warrant and did not have the opportunity to cross-examine witnesses about the search warrant.

We review due process claims, including the lack of notice and right to confrontation, de novo. *See T.H. v. State*, 349 So. 3d 951, 955 (Fla. 2d DCA 2022). "We review the denial of a *Franks* hearing for an abuse of discretion." *United States v. Jones*, 847 F. App'x 830, 833 (11th Cir. 2021). Under *Franks v. Delaware*, 438 U.S. 154 (1978), the trial court must hold an evidentiary hearing where the defendant "makes a substantial preliminary showing that [(1)] the affiant knowingly or intentionally or with reckless disregard for the truth included a false statement [or omitted material facts] in the affidavit, and [(2)] that statement [or omitted fact] was necessary to the finding of probable cause." *Pilieci v. State*, 991 So. 2d 883, 893 (Fla. 2d DCA 2008).

The record refutes Mr. Andrews' due process claims. In fact, he distorts what occurred in the trial court.

15

The parties knew and were prepared to argue the suppression matter at the next-to-last day of the multiday hearing. Defense counsel never claimed lack of notice and, indeed, was eager to proceed.

The trial court admitted evidence at the "pre-*Franks*" hearing. The trial court also allowed defense counsel ample opportunity to present witnesses. Of course, neither the State nor Mr. Andrews wanted any witnesses—which could have included witnesses that had already testified on the child hearsay issue. Instead, defense counsel explicitly chose to rely on the search warrant and the CPT video that the trial court already heard during the child hearsay hearing. Defense counsel did not want to "duplicate the evidence." Thus, the trial court did not violate Mr. Andrews' due process rights. It held an appropriate *Franks* hearing, permitting the parties to submit and rely on evidence as they desired.

## 2. Denial of Motion to Suppress

Mr. Andrews tells us that the search warrant affidavit was invalid because the affiant (a) falsely alleged that Mr. Andrews "showed" the child pornographic videos and (b) omitted material details that the videos popped up because of a "glitch" that Mr. Andrews tried to fix. The State contends that the trial court "correctly found that the affiant had not made any false statements, either intentionally or recklessly," and "[t]he victim maintained her statements consistently throughout the case."

"In reviewing the trial court's denial of the motion to suppress, we are bound by the trial court's factual findings if they are supported by competent, substantial evidence . . . ." *Garcia v. State*, 872 So. 2d 326, 329 (Fla. 2d DCA 2004). We review the legal determination of probable cause de novo, *id.*, "with a presumption of correctness given to the trial court, which in turn gave great deference to the magistrate," *Goesel v. State*, 305 So. 3d 821, 823 (Fla. 2d DCA 2020) (quoting *Coronado v.*

16

*State*, 148 So. 3d 502, 505 (Fla. 2d DCA 2014)).  We "must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling."  *Pilieci*, 991 So. 2d at 894.

When faced with a challenge to a search warrant affidavit that allegedly omits relevant facts or contains false statements, the trial court must discern (1) whether the affiant acted "with intent to deceive or with reckless disregard of whether such information should have been revealed to the magistrate" and (2) whether the omitted or false statements, if properly included or excluded, would have defeated probable cause.  *Pagan v. State*, 830 So. 2d 792, 807 (Fla. 2002).  The intentional or reckless conduct of law enforcement officials must be deceptive.  *Id.*  "The inclusion of statements by innocent mistake is insufficient . . . ."  *Id.*

The trial court concluded that the affiant properly summarized the facts in the affidavit as they were known to him.  Competent substantial evidence supports the trial court's findings.

The child's statements to the CPT interviewer support the affiant's statement that Mr. Andrews "showed" the child pornographic videos. The child stated in the CPT interview that the "videos popped up," that Mr. Andrews knew the videos popped up, and that Mr. Andrews wanted her to do what was depicted in the videos.

Further, the affiant did not omit the fact that the child stated the videos "popped up" on the laptop.  The affiant admitted in paragraph 7 of the affidavit that the child stated that the videos "would pop up on the computer and [Mr. Andrews] told her he wanted her to do that to him." Apparently, the child believed "glitch" and "[t]he video popp[ing] up" were synonymous.

17

Although the affiant did not mention that Mr. Andrews tried deleting the videos, the child stated during the CPT interview that Mr. Andrews did not delete or "shield" her from the videos. Rather, he used the videos to illustrate what he wanted the child to do to him. Accordingly, any attempt to delete the videos was not a material fact that would create substantial possibility that, if aware of the fact, the magistrate would not have issued the search warrant. *See generally State v. Schulze*, 581 So. 2d 610, 611 (Fla. 2d DCA 1991) ("The omitted facts are only material if there is a substantial possibility that had the magistrate been aware of the omission he would not have found sufficient probable cause for issuance of a warrant." (citing *State v. Van Pieterson*, 550 So. 2d 1162 (Fla. 1st DCA 1989))).

The affidavit provided a reasonable probability that pornographic videos were shown to the child on the laptop. They were relevant to the offense of showing obscene material to a minor. They tended to show that Mr. Andrews knew of the illicit content. *See generally* §§ 847.0133(1) ("A person may not knowingly sell, rent, loan, give away, distribute, transmit, or show any obscene material to a minor."), .012(1)(a) (defining, in pertinent part, "knowingly" as "having the general knowledge of, reason to know, or a belief or ground for belief which warrants further inspection or inquiry of . . . [t]he character and content of any material described in this section which is reasonably susceptible of examination by the defendant"). The facts that the videos "popped up" and Mr. Andrews may have attempted to delete them do not negate relevancy given that Mr. Andrews allowed the videos to play and used them to illustrate the sexual conduct he wanted from the child.

Mr. Andrews fails to demonstrate that the trial court erroneously denied his motion to suppress.

### 3. Admittance of 7,119 URLs

Mr. Andrews argues that the trial court erroneously admitted exhibits showing over 7,119 URLs of lawful pornography that were irrelevant, cumulative, unduly prejudicial, and improper character evidence. He asserts that the URLs "tended to show a propensity toward homosexuality, child sex offenses, bestiality, xenophobia, or other sexual proclivities." He also asserts that "there is no evidence [that he] or anyone else ever viewed the materials." The State contends the exhibits were relevant to establish that Mr. Andrews showed obscene material to a minor and to show his potential deletion of evidence, reflecting consciousness of guilt.[5]

#### A. *Preservation*

Mr. Andrews contests the admission of State's Exhibits 5, 6, 7, 9, and 10A through 10F. He does not assert fundamental error. Thus, we address only the arguments he preserved for appeal. *See generally Kenney v. State*, 373 So. 3d 378, 379 n.1 (Fla. 2d DCA 2023) ("We do not mean to imply that those arguments necessarily would have established fundamental error. We only observe that Kenney's failure to make them on appeal precludes us from even considering the possibility . . . .").

The portions of the record that Mr. Andrews cites in his initial brief and our independent review of the record do not reflect that he preserved every argument as to every exhibit that he now raises. Instead, the record reflects that defense counsel only objected to a report listing about

---

[5] Mr. Andrews asserts in his reply brief that the State only offered to admit the exhibits for propensity purposes and waived its other arguments for appellate review. This is incorrect. The State made the same arguments below. As explained below, the preservation issue lies with Mr. Andrews' arguments.

7,100 URLs for pornography that was never admitted into evidence, and to Exhibits 7 and 9.

Defense counsel objected to Exhibit 5. But she failed to specify a legal ground for the objection. *See generally* § 924.051(1)(b), Fla. Stat. (2022) (" 'Preserved' means that an issue, legal argument, or objection to evidence was timely raised before, and ruled on by, the trial court, and that the issue, legal argument, or objection to evidence was sufficiently precise that it fairly apprised the trial court of the relief sought and the grounds therefor."); *Van Loan v. State*, 779 So. 2d 497, 499 (Fla. 2d DCA 2000) ("For appellate review, an issue can only be preserved if the objection is sufficiently precise.").

We recognize that the trial court admitted Exhibit 5, along with Exhibits 6 and 10A through 10F "[s]ubject to any prior objection." But we find no specific ground for or prior objection for those exhibits. When the trial court asked what exhibits were at issue prior to the State's digital forensic expert's testimony, defense counsel did not identify Exhibits 5, 6, or 10A through 10F. Mr. Andrews objected to the digital forensic expert's testimony for various reasons, but he did not argue below, as he does now, that Exhibit 5 was inadmissible because it was cumulative to the expert's testimony about the gap in the browser history.

Nor did Mr. Andrews ever argue in the trial court that the URLs in any of the State's exhibits were bad character evidence or unduly prejudicial because of their salacious nature. Rather, he argued only that the *number* of URLs was prejudicial. *See Datus v. State*, 126 So. 3d 363, 365 (Fla. 4th DCA 2013) ("An objection on relevance grounds *only* will not preserve an argument of unfair prejudice on appeal."). Defense counsel also had an issue with some of the 7,119 URLs that were not

20

related to Disney. Defense counsel agreed, to some extent, that Exhibit 7 was admissible because some of the URLs were Disney-related. But she did not announce any concern that the URLs might "show a propensity toward homosexuality, child sex offenses, bestiality, xenophobia, or other sexual proclivities." We will not entertain a modified claim of prejudice based on the apparent salacious nature of the URLs. *See generally Chamberlain v. State*, 881 So. 2d 1087, 1100 (Fla. 2004) ("It is well-settled in Florida that '[t]o be preserved for appeal, the specific legal ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal.' " (alteration in original) (quoting *Spann v. State*, 857 So. 2d 845, 852 (Fla. 2003))).

### B. Merits

Mr. Andrews asserts that the URLs in Exhibits 7 and 9 were irrelevant because "[t]here was no way to tell if any particular material was viewed or if [Mr.] Andrews was doing the searches." The State contends that the exhibits were relevant to prove that Mr. Andrews showed obscene material to the child and to show the potential deletion of evidence, reflecting consciousness of guilt.

We review the trial court's ruling on motions in limine and admission of evidence for abuse of discretion. *Edwards v. State*, 39 So. 3d 447, 448 (Fla. 4th DCA 2010) (citing *Dessaure v. State*, 891 So. 2d 455, 466 (Fla. 2004)). Of course, "the trial court's discretion is limited by the rules of evidence, and a trial court abuses its discretion if its ruling is based on an 'erroneous view of the law or on a clearly erroneous assessment of the evidence.' " *Id.* (quoting *McDuffie v. State*, 970 So. 2d 312, 326 (Fla. 2007)).

Evidence is relevant if it tends "to prove or disprove a material fact." § 90.401, Fla. Stat. (2022). Mr. Andrews claims that the search results

21

prove nothing because no evidence established that the search results belonged to Mr. Andrews or that he showed any of the listed videos to the child. However, the State's digital forensic expert testified that the URLs from the search history were all under Mr. Andrews' laptop profile. Recall too, C.S. testified that they used the browser on the laptop to watch pornography. She also testified that Mr. Andrews had shown her a pornographic Disney movie and that he admitted that he may have watched Disney pornography while the child was at the house. The child stated that she saw Disney and cartoon pornographic videos.

Thus, search results and witness testimony indicated that Mr. Andrews showed pornography to the child. Although there were conflicts as to what happened, this goes to weight, not admissibility of the evidence. *Cf. Gore v. State*, 599 So. 2d 978, 983 (Fla. 1992) ("Testimony had previously established that Roark had a purse with her on the night she disappeared. While there are some timing problems with this testimony, as well as a lack of connection between Roark's purse and the purse Ingram saw in the car, these were matters to be considered by the jury in evaluating the weight to give this testimony and did not render the evidence inadmissible."). Mr. Andrews fails to show that the trial court abused its discretion in admitting Exhibits 7 and 9 into evidence.

## 4. Denial of the JOA Motion

Mr. Andrews argues that the trial court should have granted his JOA motion for distributing obscene material to a minor because "[t]here was no evidence offered that [Mr.] Andrews presented the materials to [the child]" when the child "consistently denied that this was the case." The State counters (1) "that after [Mr.] Andrews knew an obscene video had started playing on his computer, which the child was watching, [Mr.] Andrews took that opportunity to tell her . . . what he wanted her to do

22

to him" and (2) that Mr. "Andrews did not immediately try to turn off the video and prevent her from viewing it."

We review the trial court's denial of the JOA motion "de novo and will uphold a conviction that is supported by competent substantial evidence." *Berry v. State*, 306 So. 3d 1256, 1258 (Fla. 2d DCA 2020) (citing *Johnson v. State*, 238 So. 3d 726, 739 (Fla. 2018)).

"When moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence, but also every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." *Fountain v. State*, 318 So. 3d 626, 628 (Fla. 2d DCA 2021) (quoting *Bussell v. State*, 66 So. 3d 1059, 1061 (Fla. 1st DCA 2011)).  The State must prove each element of the offense beyond a reasonable doubt to survive a JOA motion.  *Id.*

"A person may not knowingly sell, rent, loan, give away, distribute, transmit, or show any obscene material to a minor."  § 847.0133(1). "Knowingly" is defined, in pertinent part, as "having the general knowledge of, reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both: (a) [t]he character and content of any material described in this section which is reasonably susceptible of examination by the defendant; and (b) [t]he age of the minor."  § 847.012(1); *see also* § 847.0133(2) ("As used in this section 'knowingly' has the same meaning set forth in s. 847.012(1).  A 'minor' is any person under the age of 18 years.").

Here, the trial court determined that a jury could find that, "at a minimum, . . . the defendant . . . used [the pornographic video] as instructional material, knowing that the child saw what was on there; and the pornographic nature of it appeared to be readily apparent to both of them."  Competent substantial evidence supports the trial court's

23

findings.  The child stated that Mr. Andrews knew about the contents of the videos and told her what he wanted her to do.

A jury could infer that Mr. Andrews knowingly showed the videos to the child.  *Cf. State v. Zieman*, 829 N.W.2d 589 (Iowa Ct. App. 2013) ("While Zieman may not have physically placed the tape in the VCR, he did instruct M.G. to do so.  In addition, while M.G. 'grabbed one off the top' of the box to test the machine, Zieman owned the video and watched the video with M.G. . . .  He did nothing to stop the video from continuing to play.  It was not until M.G. asked to return to work after feeling awkward watching the video with Zieman that the video was stopped.  From this evidence, the jury could infer that Zieman knowingly exhibited obscene material to M.G.  *State v. Schrie*r, 300 N.W.2d 305, 306 (Iowa 1981) ('All legitimate inferences which may fairly and reasonably be deduced [from the evidence] will be accepted.').").  The trial court did not err in denying the JOA motion.

## 5.  Prosecutor's Closing Argument

Mr. Andrews argues that "the State caused fundamental error[6] by expressing personal opinions of guilt, misstating the law regarding reasonable doubt, burden shifting, and denigrating the defense during closing argument."  He asserts that this "was a close case resting upon witness credibility [without] physical or corroborating evidence"; his conviction rested on the child's words, "which included admittedly false statements and numerous inconsistencies."  The State contends that the prosecutor's remarks "were a fair comment on the evidence."  The State

---

[6] "Fundamental error in closing argument is error that reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error."  *Augustine v. State*, 143 So. 3d 940, 941 (Fla. 4th DCA 2014) (quoting *Thompson v. State*, 88 So. 3d 322, 324 (Fla. 4th DCA 2012)).

also asserts that "[n]one of the errors alleged, either individually or collectively deprived [Mr.] Andrews of a fair trial."

### A. Personal Opinions

Mr. Andrews claims that the prosecutor erred when he expressed his personal opinions about Mr. Andrews and C.S.

Specifically, the prosecutor stated his personal belief that Mr. Andrews was "guilty of all counts." This comment was improper. *See Sempier v. State*, 907 So. 2d 1277, 1279 (Fla. 5th DCA 2005) ("The prosecutor's pronouncement that Sempier 'is guilty' and that 'he did it,' improperly injected into the jury's consideration her personal beliefs as to Sempier's guilt, and could have contributed to Sempier's conviction.").

But, Mr. Andrews did not object, and the comment did not rise to the level of fundamental error. *See Morris v. State*, 233 So. 3d 438, 447-48 (Fla. 2018) (concluding that prosecutor's comments "that Morris was 'guilty all day long,' and that 'there is no doubt,' with regards to Morris' guilt" was not fundamental error and, if the issue was preserved, it would have been harmless); *cf. Reed v. State*, 837 So. 2d 366, 370 (Fla. 2002) ("[A]ll fundamental error is harmful error. However, we likewise caution that not all harmful error is fundamental."); *Sempier*, 907 So. 2d at 1278-79 ("Generally, where there is overwhelming evidence of a defendant's guilt, a prosecutor's assertion that the defendant is guilty may be considered harmless. However, when the jury is 'walking a thin line between a verdict of guilt and innocence, the prosecutor cannot be allowed to push the jury to the side of guilt with improper comments.' " (citation omitted) (quoting *Ryan v. State*, 457 So. 2d 1084, 1091 (Fla. 4th DCA 1984))).

The line between guilt and innocence was not as thin as Mr. Andrews proposes. At trial, the child did not know or recall everything.

She also indicated on cross-examination that some of her statements to the CPT interviewer were incorrect. Yet, the child's testimony was not entirely inconsistent with her CPT interview and did not exonerate Mr. Andrews. The prosecutor, on redirect, clarified some of the child's cross-examination testimony. The child's statements, the exhibits, and witness testimony, including Mr. Andrews' statements to C.S., demonstrated that Mr. Andrews acted unlawfully. We cannot say that the prosecutor's comment, alone, constituted fundamental error.

As for C.S., Mr. Andrews asserts that the prosecutor improperly "instructed the jury not to believe [C.S.], claiming that [the child] was the reason she lost her house and her boat," which was a fact not in evidence. The prosecutor stated that when C.S. questioned the child, C.S. went from asking the child about getting in trouble at school to asking the child if she was the reason C.S. lost her house and boat. Following defense counsel's objection, the prosecutor rephrased his argument and clarified to the jury that C.S. never asked the child about the house or boat. The prosecutor, without additional objection, stated that C.S. testified that the child ruined her life and that the house and boat were sold. The prosecutor did not specify the reasons for the sales, nor did he state that C.S. blamed the child. Of course, C.S. testified that they sold the house, they used to have a boat, the child ruined her life, and she hated what the child did. The prosecutor explained the evidence and permissibly argued reasonable inferences about C.S.'s credibility. *See Miller v. State*, 926 So. 2d 1243, 1254-55 (Fla. 2006) ("[A]n attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." (citing *Craig v. State*, 510 So. 2d 857, 865 (Fla. 1987))); *Jackson v. State*, 89 So. 3d 1011, 1019 (Fla. 4th

26

DCA 2012) ("[T]he prosecutor was not expressing her own opinion on Dingle's credibility; rather, she was explaining why the jury should believe Dingle was a credible witness based on the evidence.").

### B. *Misstating the Law*

Next, Mr. Andrews argues that the prosecutor misstated the law on reasonable doubt:

> One of the biggest things I want you to focus on about reasonable doubt is it is not a mere possible doubt. It is not a speculative doubt. *It is not an imaginary doubt or forced doubt. If you go back and you find yourself saying, "Well, maybe this happened," it's not a reasonable doubt. "Is it possible that this happened," that's not a reasonable doubt. "Well, let's think, because maybe this makes more sense." Now you are forcing and coming up with speculation and imaginary doubt. So, you are not allowed to speculate.* You have been given all the evidence that you need for this crime, and that's the only evidence that you are allowed to consider. Please do not engage in speculation.

(Emphasis added.) Mr. Andrews claims that the prosecutor essentially "instructed the jury that they should consider any doubt they may have as forced and speculative." The State contends, "The prosecutor was not misstating the law on reasonable doubt. The comments followed the jury instruction which states the doubt cannot be a mere possible doubt, a speculative doubt, or an imaginary or forced doubt."

We agree with the State. *See generally Usry v. State*, 284 So. 3d 1128, 1129 (Fla. 2d DCA 2019) ("A reasonable doubt is not a mere possible doubt, a speculative, imaginary or forced doubt. Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt. On the other hand, if, after carefully considering, comparing and weighing all the evidence, there is not an abiding conviction of guilt, or, if, having a conviction, it is one which is not stable but one which wavers and vacillates, then the charge is not

27

proved beyond every reasonable doubt and you must find the defendant not guilty because the doubt is reasonable." (quoting Fla. Std. Jury Instr. (Crim.) 3.7)). The prosecutor's argument was proper.

### C. Burden Shifting

Mr. Andrews asserts that the prosecutor engaged in improper bolstering and burden shifting when he argued to the jurors that they must convict Mr. Andrews and that "[their] job is done" if they believed the child's statements in the CPT interview as opposed to the child's trial testimony. Mr. Andrews claims that the prosecutor was asking the jury to determine his guilt based upon which witnesses were lying rather than upon whether the State proved each element beyond a reasonable doubt. The State counters that the prosecutor was "not arguing that the jury could convict solely on the testimony of one of the other witnesses or solely on the basis of a CPT recording."

Read in context, the prosecutor's comments were not improper bolstering. He did not vouch for any witness's credibility. *See Gorby v. State*, 630 So. 2d 544, 547 (Fla. 1993) ("It is improper to bolster a witness' testimony by vouching for his or her credibility."); *Jackson*, 89 So. 3d at 1018-19 (reasoning that the prosecutor did not impermissibly vouch for the witness where the prosecutor did not say that *the prosecutor* believed the witness testified truthfully or otherwise interject her personal opinion).

Nor did the prosecutor's statements shift the State's burden of proving the offenses beyond a reasonable doubt. *See generally Mitchell v. State*, 118 So. 3d 295, 296-97 (Fla. 3d DCA 2013) ("[T]he standard for a criminal conviction is not which side is more believable, but whether, taking all the evidence into consideration, the State has proven every essential element of the crime beyond a reasonable doubt. For that

reason, it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt." (quoting *Gore v. State*, 719 So. 2d 1197, 1200 (Fla. 1998))).

The prosecutor reminded the jury that the child shut down on the stand. In doing so, he told the jury that they could believe the child's statements during the CPT interview and statements she made to other witnesses, even when considering the child's trial testimony. The prosecutor was allowed to comment on the weight of the evidence and the credibility of the child. *See Brown v. State*, 11 So. 3d 428, 436 (Fla. 2d DCA 2009) ("[C]omments on the weight of the evidence and the credibility of witnesses in sexual battery cases are the proper subject of argument by counsel, but such comments may not be delivered from the bench.").

The cases that Mr. Andrews cites to support his position are inapposite. The prosecutor did not imply that the defendant had to prove every witness was lying. *Cf. Mitchell*, 118 So. 3d at 296-97 (holding that the prosecutor impoperly shifted the burden by implying that the burden was for the defendant to prove that every witness was lying). The prosecutor did not ask the jury to determine if the defendant or the State was lying to find Mr. Andrews guilty. *Cf. Northard v. State*, 675 So. 2d 652, 653 (Fla. 4th DCA 1996) ("This argument was impermissible because it improperly asked the jury to determine who was lying as the test for deciding if appellant was not guilty."). Nor did the prosecutor imply that the jurors would have to find that all the witnesses lied to find Mr. Andrews guilty. *Cf. Mullins v. State*, 137 So. 3d 558, 560-61 (Fla. 4th DCA 2014) (holding that the prosecutor improperly shifted the burden by arguing that to find the defendant not guilty, jurors "would have to find

29

that all the witnesses lied").  The prosecutor's statements were not error, much less fundamental error.

### D.  Denigrating Defense

Mr. Andrews asserts that the prosecutor improperly argued that the jury should not believe the child's cross-examination testimony because the defense counsel used leading questions.  Mr. Andrews argues that the prosecutor's "arguments improperly denigrated the defense for following the proper rules of procedure" and that "the argument that cross-examination was being 'done' somehow inappropriately to [the child] improperly appealed to sympathy for the victim."

Not so.  The prosecutor did not imply that defense counsel's cross-examination was improper or attack defense counsel for asking leading questions.  The prosecutor recognized that the law permits such questions.  The prosecutor merely highlighted that the child was vulnerable to shutting down on cross-examination.  The prosecutor remained focused on the reliability of the evidence produced at trial and the child's credibility.  Consequently, the prosecutor's comments do not amount to a personal attack on defense counsel.  *Cf. Wicklow v. State*, 43 So. 3d 85, 87 (Fla. 4th DCA 2010) ("[W]hen the prosecutor made the following argument later in closing argument, 'The only conflicts are between the defense attorney and the evidence.  That's it.  Don't be manipulated . . . don't be gullible,' she was no longer focusing on the evidence, but instead on her perception of the integrity and character of defense counsel."); *Redish v. State*, 525 So. 2d 928, 931 (Fla. 1st DCA 1988) ("Lastly, we consider the prosecution's personal attack on defense counsel by referring to his 'cheap tricks' to be clearly beyond the bounds of proper closing argument.").

### E. *Cumulative Fundamental Error*

As we explained earlier, only one of the prosecutor's comments was improper. That comment about Mr. Andrews' guilt does not constitute fundamental error. Thus, there is no "combination of improper comments" that requires us to reverse and remand for a new trial. *Cf. Brown v. State*, 593 So. 2d 1210, 1212 (Fla. 2d DCA 1992) (holding that the combination of multiple improper comments required reversal).

## III. CONCLUSION

Mr. Andrews' arguments to us are either meritless or unpreserved. Accordingly, we affirm his judgment and sentences.

Affirmed.


NORTHCUTT and VILLANTI, JJ., Concur.

_____

Opinion subject to revision prior to official publication.

31