DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**NISBANY SURIT-GARCIAS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2022-3368

[July 10, 2024]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Bernard I. Bober, Judge; L.T. Case No. 18002846CF10A.

Antony P. Ryan, Regional Counsel, and Louis G. Carres, Assistant Regional Conflict Counsel, Office of Criminal Conflict and Civil Regional Counsel, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Luke R. Napodano, Senior Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Nisbany Surit-Garcias ("the defendant") appeals his convictions and sentences after a jury trial for one count of DUI manslaughter (impairment), three counts of DUI causing serious bodily injury (impairment), eleven counts of DUI causing injury, and one count of DUI causing property damage.[1] We affirm.

---

[1] The jury did not find the defendant guilty of any charges that required the jury to find as an element that the defendant had a blood alcohol level of .08 or higher at the time of the accident. Specifically, the jury found the defendant guilty of one count of DUI manslaughter (impairment); one count of DUI, a lesser included offense of DUI manslaughter (unlawful blood alcohol level); three counts of DUI causing serious bodily injury (impairment); three counts of DUI causing injury, a lesser included offense of DUI causing serious bodily injury (unlawful blood alcohol level), each causing moderate injury; eleven counts of DUI causing injury, eight causing moderate injury and three causing slight injury; and DUI causing property damage. The defendant also pleaded no contest to driving with a suspended license.

### The Crash

This case arose out of a tragic collision on Alligator Alley. At about 5:34 p.m. on March 6, 2018, fifteen family members were traveling in a rental van on a return trip from a spring training baseball game when a Ford F-150 pickup truck driven by the defendant struck the van while attempting to pass it. As a result, the van veered onto the shoulder, flipped, and rolled over several times. Multiple passengers were ejected from the van. One ejected passenger died as a result of the crash.

Shortly before the incident, multiple witnesses observed the defendant's truck (or a truck that looked similar) driving erratically and at a high rate of speed. One witness said that the driver of the truck appeared "glued" to a phone in his hand.

A traffic homicide investigator testified that the night was clear and environmental factors did not contribute to the crash. He also determined that the pickup truck traveled at an average speed of 86 miles per hour between the time it left a toll plaza at 4:52 p.m. and the time of the crash at 5:34 p.m.

Inside the defendant's truck, law enforcement found two bottles of Bacardi Black Rum, one sealed and the other about three-quarters empty. The bottles of rum had been purchased at a liquor store in Fort Myers at 3:56 p.m. on the day of the crash.

DNA swabs taken from the airbag and the driver's side seatbelt of the truck matched the defendant's DNA sample. The defendant admitted at the scene that he had been driving the truck. Also, the defendant suffered a seatbelt burn consistent with him sitting on the driver's side of a vehicle.

The State presented substantial evidence throughout the trial regarding the injuries to the fourteen surviving occupants of the van. For the purpose of this opinion, it is sufficient to say that each surviving victim suffered at least some injury.

### Prosecutor's Opening Statement Referring to a Blood Alcohol Level

During opening statement, the prosecutor said the evidence would show that the defendant had a blood alcohol level of .14 at 7:39 p.m. and .10 at 9:54 p.m. The prosecutor went on to say that Dr. Kunsman—who had previously been identified to prospective jurors as a witness from the medical examiner's office—had determined that the defendant's blood alcohol level was 0.17 at the time of the crash:

However, because the two blood samples that were taken at 7:39 and 9:54 p.m. were -- were close in time enough to the crash, Dr. Kunsman was able to use a scientifically reliable method.  And he determined at the time of the crash at 5:34 p.m. the Defendant had a blood alcohol level of 0.17, more than twice the legal limit.  So, at 5:34 p.m. he's at a 0.17.  That's when the crash happens.  Two hours later at 7:39 p.m. when everybody is starting to observe and then make those observations, he's at a 0.14.  And then at 10:00 p.m. he's at a 0.10.

The prosecutor also displayed a chart showing that the defendant had a blood alcohol level of 0.17 at the time of the crash.

### *Trial Evidence About the Defendant's Blood Alcohol Level*

Blood draws taken on the night of the accident showed that the defendant's blood alcohol level was 0.14 at 7:39 p.m. and 0.10 at 9:54 p.m.  Dr. Gary Kunsman, chief toxicologist at the Broward County Medical Examiner's Office, testified that a blood alcohol level of .05 impairs short-term memory, upper body balance, and fine motor control, and begins to affect peripheral vision.  At a level of .08, the effect on peripheral vision is more noticeable, glare recovery is impaired, risk-taking behavior is increased, reaction time is slowed, and drowsiness starts to occur.

Dr. Kunsman testified that "retrograde extrapolation" is a mathematical process for using a person's blood alcohol concentration at the time of collection to estimate the concentration at an earlier time.  This calculation "requires a number of assumptions," including that the person metabolizes alcohol at a normal rate and, most importantly, that the person is "post-absorptive."  The term "post-absorptive" means that the person is no longer absorbing alcohol and is only eliminating alcohol.

When asked on direct examination whether he was able to perform a retrograde extrapolation of the defendant's blood alcohol concentration at the time of the accident if he made certain assumptions (including that the defendant was post-absorptive), Dr. Kunsman testified: "I am able to do so, but I will not."

Dr. Kunsman's refusal to perform a retrograde extrapolation was due to "the variability between people" and "the nature of making assumptions."  Dr. Kunsman had found over the course of his career that performing a retrograde extrapolation causes confusion and is

3

counterproductive. Nevertheless, based upon the assumptions the prosecutor provided and the fact that a person's blood alcohol concentration was 0.14 at 7:39 p.m., Dr. Kunsman opined that the person "would have had a blood alcohol concentration of at least a .14 or higher" at 5:34 p.m.

On cross-examination, Dr. Kunsman conceded that "if the person is not post-absorptive at the time that you're trying to go back to, then retrograde extrapolation is absolutely meaningless." Dr. Kunsman acknowledged that if a person drinks a lot of alcohol in a short period of time and then leaves a location, the person is unlikely to be post-absorptive at the time they left. Whether a person has become post-absorptive would depend on the time between the last drink and the incident.

Dr. Kunsman clarified that a person becomes post-absorptive when they reach their peak blood alcohol content. Most people reach their peak blood alcohol level about 30 to 90 minutes after their last drink, but it can take as long as two-and-a-half hours. A number of studies have shown that "by the time . . . a person consumes their last drink to the time of an incident, they are usually in the post-absorptive phase," but those studies involved people who stopped drinking before they got into the vehicle and drove. Dr. Kunsman explained that drinking in the car is a "completely almost novel situation," as it is "not something that comes up" often and "nobody studies" it.

Dr. Kunsman explained that his opinion on direct examination that the person would have had at least a 0.14 blood alcohol level at 5:34 p.m. was "based on general knowledge we have about alcohol use," and that he did not know whether it applies "to the particular individual in this case." Dr. Kunsman admitted that with only two data points, nothing would allow him to reconstruct the defendant's blood alcohol curve "without assumptions." Dr. Kunsman noted that he only formulates his opinions based on the toxicological data, so he did not review any police reports, witness statements, or video evidence. And Dr. Kunsman admitted that if he could not assume a person was post-absorptive at the time of the incident, then he could not "tell us anything about what that person's blood alcohol content would have been at that time."

On redirect, Dr. Kunsman testified that if the alcohol was consumed in a "typical social drinking scenario," then he would expect "the alcohol concentration at the incident would probably have been at least a .14 or higher." However, Dr. Kunsman added that "throwing in drinking essentially at the time of the incident" was a confounding factor. If the entire drinking period occurred while the person was driving, then Dr.

4

Kunsman would "have no idea what the concentration would have been at the time of the incident."

Dr. Kunsman acknowledged that if the drinking period lasted from 4:00 p.m. to 5:30 p.m. and involved the consumption of eight to twelve standard drinks, "it's very possible that the .14 is the peak alcohol concentration. But it might not be." When asked if the defendant could have had a blood alcohol level at .05 two hours earlier, Dr. Kunsman opined: "If all of the alcohol consumption is close to the time of the incident, then it's just not possible to say what the concentration would have been."

Assuming the drinking period was from 4:00 p.m. to 5:00 p.m., Dr. Kunsman testified that "if they're still absorptive, then you can't tell what the concentration is." Dr. Kunsman emphasized that it is "very complicated to try and determine what an alcohol concentration would have been, so close to the time of [the incident] if all of the drinking occurred in that hour or so timeframe."

Dr. Kunsman's opinion that the defendant's blood alcohol was unlikely to be lower than 0.14 at the time of the incident was "based on the premise that the alcohol consumption is in a more normal social drinking type of behavior where it's slow and steady," rather than a scenario of drinking a large number of drinks quickly or drinking in the car.

### *Motion for Mistrial*

At the close of the State's case, the defendant moved for a mistrial because the prosecutor told the jury in opening that the toxicologist would testify that the defendant's blood alcohol level was 0.17 at the time of the crash, but no such evidence was presented to the jury.

The prosecutor responded by referring to Dr. Kunsman's deposition; there the witness relied upon the 0.14 measurement taken two hours after the accident to opine that the defendant's blood alcohol level would have been "at or around" 0.17 at the time of the crash, provided that the defendant was post-absorptive and that other assumptions were true. Among other things, the prosecutor argued that: (1) he had a good faith basis to mention the 0.17 calculation in his opening statement "because Dr. Kunsman was asked that question by the defense in deposition"; and (2) Dr. Kunsman was subject to cross-examination by the defense.

The trial court denied the motion for mistrial.

5

### *Other Evidence of the Defendant's Impairment*

Multiple witnesses testified regarding their observations of the defendant and his driving before and after the crash.

Another driver on the highway testified that the defendant nearly ran into his vehicle. He observed the defendant driving, with a phone in his hand, all over the road. This driver then came upon the accident scene and stopped before the police arrived. He saw the defendant get out of his truck and walk around. However, during the entire time this driver saw the defendant at the crash site, he saw nothing that made him think the defendant had been drinking or was under the influence of alcohol.

A passenger in the car described in the preceding paragraph spoke to the defendant in Spanish at the scene of the accident. According to him, the defendant's eyes were "kind of red" and he seemed disoriented. However, the passenger did not smell alcohol and he admitted that nothing in his interaction with the defendant suggested to him that the defendant was impaired by alcohol.

A trooper arrived at the scene and saw the defendant coming out of the top of the truck on the driver's side. The trooper saw the defendant picking things up and putting them in a bucket. When the trooper approached the defendant to ask if he was okay, the trooper noticed that the defendant was disoriented and had an odor of alcohol on his breath.

Three other law enforcement officers at the scene observed various signs of the defendant's alcohol use—the odor of an alcoholic beverage, slurred speech, difficulty walking, confusion, and red and watery eyes.

A paramedic described the defendant as having an altered level of consciousness, meaning that he was not completely aware and alert. The defendant's pupils were constricted, he was disoriented, he appeared dazed and lethargic, he had difficulty keeping his eyes open, and he would respond only when prompted. Paramedics administered Narcan, which allowed the defendant to speak more clearly. Paramedics smelled possible ethyl alcohol. The paramedic assessed the defendant's altered level of consciousness as having an unknown cause, but he noted "possible opioid/alcohol" use.

Another paramedic likewise testified that the defendant was potentially altered, meaning that he could have been on medications, drugs, or alcohol. This paramedic noted that the defendant was not answering questions appropriately.

At the hospital where the defendant's blood was drawn, three other troopers made similar observations consistent with the defendant's consumption of alcohol.

### *Victim Injury Issue*

Prior to trial, the defendant moved to declare the Criminal Punishment Code's victim injury point categories of "severe," "moderate," and "slight" unconstitutionally vague because these terms are not defined. The trial court denied the motion.

During the charge conference, the defendant renewed the motion and argued that the sentencing scheme gives no guidance to allow a jury to differentiate among the various injury categories.

The trial court determined that the jury could not be given a choice to find severe injury on counts where serious bodily injury was not charged, but otherwise overruled the defendant's objections.

### *Adjudication and Sentence*

Following the jury's guilty verdicts, the trial court adjudicated the defendant guilty of one count of DUI manslaughter (impairment), three counts of DUI with serious bodily injury (impairment), eleven counts of DUI with injury, one count of DUI with property damage, and one count of driving with a suspended license. The court sentenced him to 396.6 months in prison, with a four-year mandatory minimum for DUI manslaughter, followed by one year of probation plus restitution.

### *The Trial Court Did Not Abuse its Discretion in Denying a Motion for Mistrial Based on the Failure of the State to Offer Retrograde Extrapolation Evidence that the Defendant's Blood Alcohol Level Was 0.17 at the Time of the Crash*

The defendant argues that the trial court abused its discretion in denying his motion for mistrial where the prosecutor told the jury in opening statement that an expert determined the defendant's blood alcohol level to be 0.17 at the time of the crash, but produced no such evidence at trial. We hold that no abuse of discretion occurred; moreover, even assuming error existed, such error was harmless beyond a reasonable doubt.

A trial court's ruling on a motion for mistrial is reviewed for an abuse of discretion. *Jackson v. State*, 89 So. 3d 1011, 1018 (Fla. 4th DCA 2012). "An order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial." *Dessaure v. State*, 891 So. 2d 455, 464–65 (Fla. 2004).

In an opening statement, a prosecutor "may outline the facts which he, in good faith, expects to prove and which are competent for him to prove." *Paul v. State*, 209 So. 2d 464, 464 (Fla. 3d DCA 1968).

A prosecutor's failure to present evidence of a fact mentioned in opening statement warrants a mistrial if the reference prejudices the defendant's right to a fair trial. Such prejudice occurs when the factual reference suggests additional evidence of the defendant's guilt that is never subjected to cross-examination and evaluation by the jury.

Thus, in *Maddox v. State*, 827 So. 2d 380, 381 (Fla. 3d DCA 2002), the prosecutor in opening statement discussed an incriminating statement the defendant made to the responding officer. But the State never called that officer to testify. *Id.* The Third District reversed the defendant's convictions, holding that the prosecutor's disclosure in opening prejudiced the defendant "because the State basically suggested that there was other evidence in support of its case, but then failed to offer it and subject it to cross-examination by [the defendant] and evaluation by the jury." *Id.*

Similarly, in *Jackson v. State*, 818 So. 2d 539 (Fla. 2d DCA 2002), the prosecutor told the jury in opening statement that the defendant's passenger indicated to a police officer during a traffic stop that there was contraband in defendant's groin area. *Id.* at 542. The Second District held that the defendant was entitled to a mistrial because the officers did not testify to any gesture or statements, and the passenger did not testify. *Id.* The court observed that the defendant was prejudiced by the State's suggestion that other evidence existed in support of its case, coupled with the State's failure to offer such evidence and thereby subject it to cross examination by the defense and evaluation by the jury. *Id.*

Where the defendant's right to a fair trial is prejudiced, a mistrial is warranted even when the State's failure to present the evidence referenced in the opening statement is through no fault of its own. *See Mills v. State*, 875 So. 2d 823, 826 (Fla. 2d DCA 2004) (holding that the trial court erred in denying a mistrial when the State failed, through no fault of its own, to present a witness after the prosecutor's opening statement had extensively recited the witness's anticipated testimony implicating the defendant).

8

On the other hand, the State's failure to present evidence promised in the opening statement does not require a mistrial if the reference is not so prejudicial as to vitiate the trial.

In *Williams v. State*, 947 So. 2d 517, 519 (Fla. 3d DCA 2006), the prosecutor referred in opening statement to the expected testimony of a witness who failed to testify. The Third District held that the error was harmless where nothing indicated the prosecutor had acted in bad faith, and the witness's anticipated testimony had been introduced through other witnesses or was tangential or irrelevant. *Id.*

*Perez v. State*, 919 So. 2d 347, 362–64 (Fla. 2005), is another case where a prosecutor's statement of fact in opening did not justify a mistrial where the fact was not later established by evidence at trial. In *Perez*, the prosecutor said in opening statement that the defendant "always carried" a knife. *Id.* at 362. The Florida Supreme Court held that the comment did not warrant a mistrial for a number of reasons: (1) "[g]iven the evidence that the State anticipated presenting at trial and the overall nature of the single isolated comment made by the prosecutor"; (2) the issue of whether the defendant carried a knife was relevant; (3) the prosecutor "made the comments in good faith with the expectation that they would be established by evidence he anticipated presenting during trial," and (4) although the transcript of the defendant's interview with police did not indicate that the defendant "always" carried a knife, he did admit that he carried a knife at times.

In this case, the trial court did not abuse its discretion in denying the motion for mistrial. The statement was not so prejudicial as to vitiate the entire trial.

First, the prosecutor had a good faith basis to make this assertion in opening. Dr. Kunsman had opined in his deposition that the defendant's blood alcohol level would have been "at or around" 0.17 at the time of the crash, given various assumptions. We reject the defendant's suggestion that the mention of the 0.17 in opening statement was "fully purposeful for an unfair tactical advantage." The defendant has not pointed to any record evidence that the prosecutor knew in advance that Dr. Kunsman would refuse on direct examination to perform a retrograde extrapolation of the defendant's blood alcohol level at the time of the crash.

More importantly, taken as a whole, Dr. Kunsman's testimony made clear to the jury what inferences could and could not be made about the defendant's blood alcohol level at the time of the crash based upon the

9

defendant's subsequent test results, including the necessary assumptions underlying any such inferences. The jury was aware that Dr. Kunsman was the source of the prosecutor's statement in opening. He was fully available for cross-examination at trial. His actual testimony was more nuanced and more favorable to the defendant than the testimony the prosecutor described in opening.

After hearing the prosecutor's opening statement as well as Dr. Kunsman's entire testimony, the jury would have understood that the prosecutor's mention of a 0.17 blood alcohol figure referred to a retrograde extrapolation that Dr. Kunsman had performed. However, Dr. Kunsman emphasized to the jury that he believed retrograde extrapolations caused confusion and were counterproductive.

Although Dr. Kunsman was able to perform a retrograde extrapolation, he refused to do so at trial due to "the variability between people" and the nature of the required assumptions. One of the required assumptions is that a person is post-absorptive at the time of the incident. But Dr. Kunsman conceded that "if the person is not post-absorptive at the time that you're trying to go back to, then retrograde extrapolation is absolutely meaningless." In fact, although Dr. Kunsman was willing to opine on direct examination that a person whose blood alcohol concentration was 0.14 at 7:39 p.m. "would have had a blood alcohol concentration of at least a .14 or higher" at 5:34 p.m. if certain assumptions were true, he later made clear that this opinion was "based on the premise that the alcohol consumption is in a more normal social drinking type of behavior where it's slow and steady." Dr. Kunsman noted that this opinion was not based on a scenario of a person drinking a large number of drinks quickly or drinking in the car. Dr. Kunsman admitted that if the entire drinking period occurred while the person was driving, he would have "no idea" what the concentration would have been at the time of the incident. In short, Dr. Kunsman opined that "[i]f all of the alcohol consumption is close to the time of the incident, then it's just not possible to say what the concentration would have been."

Ultimately, this is not a case where the jury was left with a misleading impression that Dr. Kunsman had an undisclosed belief that the defendant's blood alcohol level could be reliably determined to be 0.17 at the time of the crash. Indeed, Dr. Kunsman's testimony overall was favorable to the defense, and it became a key theme of the defense's closing argument.[2]

---

[2] The defense attorney argued in closing:

10

Finally, any error on this issue was harmless beyond a reasonable doubt. As the State points out, the jury acquitted the defendant of all counts that required the jury to find as an element that he had a blood alcohol level of .08 or higher at the time of the accident. It was not necessary for the jury to rely on a specific blood alcohol level to find that the defendant was impaired at the time of the crash. At least ten witnesses observed the defendant showing signs of impairment by alcohol, including multiple witnesses who observed him at the accident scene shortly after the crash.

### *The Portions of the Criminal Punishment Code Describing Victim Injury as "Severe," "Moderate," and "Slight" are Not Unconstitutionally Vague*

The defendant next argues that the trial court erred by denying his motion to declare the statutory provision for victim injury points unconstitutional for vagueness and by overruling his objection to jury instructions that did not define victim injury. The defendant maintains that the jury instructions failed to give adequate guidance to the jury in determining when an injury is severe, moderate, or slight.

"The determination of a statute's constitutionality is a question of law subject to de novo review." *Henry v. State*, 134 So. 3d 938, 944 (Fla. 2014). The propriety of a jury instruction is likewise reviewed de novo. *Rodriguez v. State*, 174 So. 3d 502, 505 (Fla. 4th DCA 2015).

A criminal statute is unconstitutionally vague if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 617 (1954). "The language of the statute must provide a definite warning of what conduct is required or prohibited, measured by common understanding and practice." *Brown v. State*, 629 So. 2d 841, 842 (Fla. 1994) (internal quotation marks omitted). "The citizen cannot be held to

---

I want to start with a quote from this trial. Dr. Kunsman was on the stand on August 18th, 2022. And the prosecutor asked him, now, what if the entire drinking period was while driving? And Dr. Kunsman answered, that I have no idea what the concentration would have been at the time of the incident. This whole case and – and everything that I'm going to talk about over the next hour or so boils down to that statement. The chief toxicologist for Broward County, the toxicology expert called by the State of Florida, has no idea how much alcohol was in Mr. Surit Garcias' blood at the time of the incident. And if he doesn't know, how can you?

answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 393 (1926).

Likewise, "vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute." *United States v. Batchelder*, 442 U.S. 114, 123 (1979).

For example, *Johnson v. United States*, 576 U.S. 591 (2015), demonstrates that a sentencing statute is not unconstitutionally vague when it requires a focus on the facts of a case as opposed to an abstract, hypothetical standard. In *Johnson*, the Supreme Court struck as void for vagueness the Armed Career Criminal Act's residual clause, which defined "violent felony" for purposes of the defendant's prior criminal record as any felony that "involves conduct that presents a serious potential risk of physical injury to another." *Id.* at 593.

By way of background, the Court had previously adopted a "categorical approach" when deciding whether an offense is a violent felony for purposes of the defendant's prior record, looking "only to the fact that the defendant had been convicted of crimes falling within certain categories, and *not to the facts underlying the prior convictions.*" *Id.* at 604–05 (emphasis added).

Turning to the residual clause, the *Johnson* Court wrote that "[t]wo features of the residual clause conspire to make it unconstitutionally vague." *Id.* at 597. First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime" because "[i]t ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony," as "[i]t is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." *Id.* at 598.

To be void for vagueness, a statute must be "impermissibly vague in all of its applications." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982). For example, in *Morton v. State*, 988 So. 2d 698 (Fla. 1st DCA 2008), the First District held that a felony hazing law was not void for vagueness, despite the failure of the statute to define "serious bodily injury," because a person of ordinary intelligence would reasonably expect to incur criminal sanctions if he or she helped inflict injuries such as those suffered by the victim, who received 150 cane

strikes to his buttocks during a hazing ritual, resulting in injuries which a reasonable person would regard as "serious" under commonly accepted definitions of the term.

Importantly, "the legislature's failure to define a statutory term, taken alone, does not render a provision unconstitutionally vague." *Foster v. State*, 937 So. 2d 742, 744 (Fla. 4th DCA 2006). "In the absence of a statutory definition, resort may be had to case law or related statutory provisions which define the term, and where a statute does not specifically define words of common usage, such words are construed in their plain and ordinary sense." *State v. Hagan*, 387 So. 2d 943, 945 (Fla. 1980). "[T]he plain and ordinary meaning of the term can be ascertained by reference to a dictionary." *Jones v. Williams Pawn & Gun, Inc.*, 800 So. 2d 267, 270 (Fla. 4th DCA 2001).

"Severe," "moderate," and "slight" victim injury are not defined by the Criminal Punishment Code. *See* §§ 921.0021, 921.0024, Fla. Stat. (2017). Case law has provided guidance as to the application of these terms. The First District has applied the plain and ordinary meaning of "severe." *Butler v. State*, 297 So. 3d 691, 695 (Fla. 1st DCA 2020). Using Merriam-Webster's dictionary definition, the First District has defined "severe" as "serious" or "of a great degree." *Id.* (quoting *Severe*, Merriam-Webster's Collegiate Dictionary (11th. ed. 2003)). Also, a jury's finding of DUI with serious bodily injury supports the imposition of points for severe victim injury. *Arrowood v. State*, 843 So. 2d 940, 941 (Fla. 1st DCA 2003).

However, an acquittal for a charge requiring proof of "great bodily harm" precludes the imposition of severe victim injury points on a lesser included offense. *Key v. State*, 837 So. 2d 535, 537 (Fla. 2d DCA 2003). "Great bodily harm defines itself and means great as distinguished from slight, trivial, minor, or moderate harm, and as such does not include mere bruises as are likely to be inflicted in a simple assault and battery." *Id.* (internal quotation marks omitted).

"Moderate" is defined as "not violent, severe, or intense" or "limited in scope or effect." *Moderate*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/moderate (last visited June 17, 2024). A moderate injury must be "more than slight." *See Tillman v. State*, 819 So. 2d 913, 914 (Fla. 3d DCA 2002) (affirming finding of moderate victim injury where the injury was "more than slight," as the injured detective had to be on light duty for three months, wear an ankle brace, and regularly attend physical therapy and doctors' appointments).

13

"Slight" is "small of its kind or in amount." *Slight*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/slight (last visited June 17, 2024). For example, only slight injury points were warranted where the victims were kicked but there was no evidence of medical expenses, physical therapy, or lost income. *Kingsley v. State*, 682 So. 2d 641, 641 n.1 (Fla. 5th DCA 1996).

"[D]rawing the line between slight and moderate injuries is not an easy task." *Poole v. State*, 753 So. 2d 698, 698–99 (Fla. 4th DCA 2000). This court has therefore applied the rule of lenity in close cases involving the various categories of victim injury. Our approach is consistent with section 775.021(1), Florida Statutes (2020), which provides:

> The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.

In *Poole*, for example, we applied principles of lenity and reversed the assessment of moderate victim injury points, holding that "the injuries were, at most, slight" where "one officer received cuts and bruises," two officers were hit by flying glass but there were no injuries other than tiny nicks, and one officer fell and was stunned but was not damaged. 753 So. 2d at 698–99.

Even slight injury points cannot be assessed where the victim denies injury from the contact or where nothing indicates the victim suffered any discomfort or even slight injury. *See Mincey v. State*, 468 So. 2d 473 (Fla. 4th DCA 1985) (no slight injury points where officers denied injury); *Lynn v. State*, 687 So. 2d 39 (Fla. 5th DCA 1997) (no slight injury points where nothing indicated officer suffered discomfort or even slight injury from being kicked).

We conclude that the Criminal Punishment Code's victim injury categories of "severe," "moderate," and "slight" are not void for vagueness, even though these terms are not defined in the statute. "Severe," "moderate," and "slight" are common English words. They must be construed in their plain and ordinary sense. The dictionary definitions of these words are consistent with their plain and ordinary meaning. These terms are not complicated and are within the common understanding of jurors.

Case law has provided additional guidance, with courts addressing the sufficiency of the evidence to support various injury categories in specific

cases.  The application of the rule of lenity in close cases undermines the contention that the categories are too uncertain to be rationally and evenly applied.  In a borderline case, any uncertainty as to the application of these terms is resolved in favor of the defendant.

This case is distinguishable from *Johnson*, which involved a statute that required a judge to make an abstract assessment—without reference to real-world facts—as to whether a particular felony posed a serious potential risk of physical injury.  Victim injury points for "severe," "moderate," and "slight" injury are assessed under the Criminal Punishment Code based upon a factfinder's application of the ordinary meanings of these terms to real-world facts.

The scheme of assessing victim injury points based on severity is not vague in all its applications.  Tellingly, the defendant does not challenge the sufficiency of the evidence supporting the jury's findings of "serious," "moderate," or "slight" injury on any particular count.  Because the terms "severe,"[3] "moderate," and "slight" have a plain and ordinary meaning that may be understood by a person of ordinary intelligence, the Code's victim injury point categories are not void for vagueness.

### Conclusion

We have considered the other arguments raised and conclude that they are without merit.  We therefore affirm the defendant's convictions and sentences.

*Affirmed.*

KLINGENSMITH, C.J., and FORST, J., concur.

\*　　　\*　　　\*

**Not final until disposition of timely filed motion for rehearing.**

---

[3] The imposition of "severe" victim injury points on certain counts was based on the jury's finding of DUI with "serious" bodily injury, which supports the imposition of "severe" victim injury points.  *See Arrowood*, 843 So. 2d at 941.  In any event, the defendant does not raise the argument that the jury needed to make a specific finding of "severe" injury as distinct from its finding of "serious" injury.